**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re Applied Optoelectronics, Inc. Securities Litigation | Case No. 4:18-cv-03544 |
| | Judge Sim Lake |
| | CLASS ACTION |
| | **<u>JURY TRIAL DEMANDED</u>** |

**AMENDED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE ......................................................................... 6

III.   PARTIES ............................................................................................................. 7

    A.     Plaintiffs .................................................................................................. 7

    B.     Defendants .............................................................................................. 7

IV.    OVERVIEW OF DEFENDANTS' FRAUD ..................................................... 8

    A.     AOI's Operations .................................................................................... 8

    B.     AOI's Data Center Segment Is the Core of the Company's Business, and Provides the Vast Majority of Its Revenue ............................................ 9

    C.     The Market Doubts AOI's Ability to Keep Pace in the 100G Space ................... 12

    D.     Defendants Announce and Tout as Lucrative the Supply Agreement with Facebook for CWDM Products, Easing Investors' Concerns ............................... 13

    E.     Defendants Represent that the Company Will Double 100G Volumes in the Second Half of 2018 ....................................................................... 15

    F.     Defendants Issue Ambitious 3Q18 Guidance, and Reaffirm AOI's 100G Ramp Up in the Second Half of 2018 Based on Committed Orders from Facebook ............................................................................................... 16

    G.     Behind the Scenes, a Product Defect in the 100G CWDM Transceivers Leads AOI to Stop Shipments to Facebook, and the Company's Revenue Craters .................................................................................................. 18

    H.     Defendants Belatedly Update AOI's Materially Misleading 3Q18 Guidance ................................................................................................ 19

    I.     Post-Class Period Events ........................................................................ 21

V.     MATERIALLY MISLEADING STATEMENTS OR OMISSIONS OF MATERIAL FACT ............................................................................................ 22

VI.    LOSS CAUSATION .......................................................................................... 24

VII.   SUMMARY OF DEFENDANTS' SCIENTER ................................................ 29

VIII.  PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ..................... 31

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....................................................................... 33

X.     CLASS ACTION ALLEGATIONS .................................................................. 33

XI.    CAUSES OF ACTION ...................................................................................... 35

XII.   PRAYER FOR RELIEF ..................................................................................... 39

XIII.   JURY TRIAL DEMANDED ............................................................................................39

Court-appointed Lead Plaintiff Mark Naglich and additional Plaintiff Rick Fasnacht ("Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action on behalf of themselves and a class ("Class") consisting of all persons and entities that purchased or otherwise acquired the securities of Applied Optoelectronics, Inc. ("AOI," "Applied Optoelectronics," or the "Company") from August 7, 2018 through September 27, 2018, inclusive (the "Class Period"). Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, against Thompson Lin and Stefan J. Murry (the "Individual Defendants"), and AOI (collectively, "Defendants").

Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the ongoing investigation undertaken by Plaintiffs' counsel, which includes, but is not limited to, reviewing and analyzing: (i) AOI's public filings with the SEC; (ii) press releases and other public statements issued by Defendants; (iii) research reports that securities and financial analysts prepared concerning the Company; (iv) media and news reports related to AOI; (v) transcripts of AOI's earnings and other investor conference calls; (vi) publicly available presentations, press releases, and interviews by AOI and its employees; (vii) economic analyses of the movement and pricing of AOI's publicly traded securities; and (viii) media reports and other publicly available information concerning Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.     This case arises from Defendants' deliberate decision to conceal from investors that a serious product defect had both: (i) caused AOI to suspend *all* product shipments and receipt of related revenue under the Company's most important and highly touted supply contract with

Facebook, Inc. (the "Supply Agreement"); and (ii) rendered Defendants' putatively "conservative" third quarter 2018 financial guidance (the "3Q18 Guidance")—issued a short time earlier on August 7, 2018—unattainable and misleading.

2.     AOI's decision to suspend deliveries under the Supply Agreement caused a clear, immediately perceivable, and negative impact on the Company's revenue.  Despite Defendants' awareness of that impact, they never informed investors that AOI had stopped shipping to Facebook, even though that decision rendered the 3Q18 Guidance materially misleading.  Instead, Defendants came clean only *after* securities analysts—through reports issued on September 27, 2018—revealed that AOI had shipped defective products to Facebook, and estimated the resulting blow to the Company's 3Q18 performance.  The next day, Defendants slashed AOI's 3Q18 Guidance *by nearly $30 million*,[1] reducing expected quarterly revenue by more than 33%.  In response to the Company's belated September 28, 2018 update, AOI's stock price declined *by more than 22%* in just two trading days, causing Plaintiffs and other Class members to suffer damages.

3.     AOI provides fiber-optic networking products.  Its primary business is servicing large internet-based data center operators, like Facebook.  The Company supplies its data center customers with optical transceivers, which are devices that use fiber-optic technology to send and receive data.  The transceivers facilitate high-speed communications within a data center's servers.  To build transceivers, manufacturers use one or more multi-gigabit lasers, which are semiconductor chips that convert an electric signal into an optical one.

4.     The Company operates in a fiercely competitive industry, and is exposed to significant customer concentration risk in its markets.  Accordingly, establishing and maintaining

---

[1] Unless otherwise noted, all emphasis is added, and all internal citations and quotation marks are omitted.

sales with AOI's limited number of major data center operator customers is essential to the Company's success and stability.  In fact, nearly 78% of AOI's total revenue in 2017 came from just three data center customers—Facebook, Amazon, and Microsoft.

5.      By the beginning of 2018, AOI's primary customers' transceiver of choice was the 100G CWDM (or coarse wavelength division multiplexing) model.[2]  As a result, investors were hyper-focused on actual and projected 100G shipments from both the Company and its competitors, as well as AOI's customer mix.  Because AOI had recently struggled to provide products that met customers' growing demand for newer transceiver models, the market openly questioned whether the Company could keep pace with competitors for Facebook's demand and whether AOI was losing (or would lose) valuable market share.

6.      As market doubt continued to grow, in February 2018, Defendants formally announced and were quick to spotlight the purportedly lucrative new Supply Agreement.  To this end, they boasted to investors "a minimum commitment for the first year that represents, at a minimum *$125 million* [in revenue] for one product family."  To put that number in perspective, AOI's data center business generated approximately $306 million in revenue during the entirety of 2017, across *all* customers and products.  Put differently, Defendants introduced the Supply Agreement as a single deal that, by itself, would guarantee minimum revenue equal to *more than 40% of the Company's entire data center revenue for the preceding year*.

7.      In connection with announcing the Supply Agreement, Defendants also proclaimed that in the second half of 2018, AOI planned to "*more than double" volumes in 100G* based in large part (if not entirely) on "committed orders" under the Supply Agreement.  Similarly,

---

[2] The "100G" moniker refers to the speed at which a transceiver transmits data in gigabits per second (or "Gs").

Defendants represented that AOI would book the lion's share of the minimum $125 million in 2018 revenue from sales to Facebook during the second half of the year.

8.      While neither AOI nor Facebook disclosed the specific product family at issue in the Supply Agreement, investors understood that Facebook was purchasing 100G CWDM transceivers from AOI.   In fact, a Master Purchase Agreement—kindred to the Supply Agreement—includes an entire "Quality Control Plan for *Optical Transceivers* at Facebook, Inc.," which spans 12 pages.

9.      With full knowledge of this, Defendants assured investors that AOI was "very well positioned in this market for CWDM," and claimed that the Company's "transceiver products feature AOI lasers with superior performance and excellent reliability."

10.      Against this backdrop, on August 7, 2018, Defendants issued to the market what Defendant Murry characterized as "conservative" guidance for AOI's third quarter 2018 performance, anchored by sales the Company claimed were already booked under the Supply Agreement.   Among other things, Defendants told investors that AOI expected "[r]evenue in the range of $82 million to $92 million," and that the 3Q18 Guidance "encompass[ed] the range of possibilities that we see out there."

11.      Not surprisingly, the market embraced AOI's 3Q18 Guidance as proof that AOI's Supply Agreement with Facebook was flourishing, and that the Company was well on its way to realizing the promised $125 million minimum in 2018 revenue thereunder.

12.      Behind the scenes, however, Defendants quickly learned that AOI could not and would not achieve its 3Q18 Guidance.   Specifically, Defendants identified a debilitating issue with the 25G laser chips that AOI used in its prized 100G CWDM transceivers—the lynchpin of the Supply Agreement.   The product defect was so significant that Defendants elected to halt all

shipments of transceivers to Facebook while the Company scrambled to comprehend the problem, manufacture replacement chips and transceivers, and repair its relationship with Facebook.

13.     Given the centrality of the Supply Agreement to AOI's 3Q18 performance, as soon as Defendants halted shipments to Facebook, it was obvious that AOI could not meet the quarterly revenue guidance (and, in turn, earnings figures) that Defendants provided on August 7, 2018. Indeed, AOI recognizes revenue as soon as it ships its products.  Thus, when Defendants halted shipments to Facebook, a hole in AOI's revenue arose immediately.  Because AOI lacked any non-defective product on hand with which to satisfy Facebook's demand, the Company could not bridge the gap or prevent it from widening.  The revenue shortfall continued to grow unabated for the remainder of the quarter.

14.     Meanwhile, Defendants kept the market in the dark.  Having chosen to publish to the market positive concrete guidance for AOI's 3Q18 performance, which Defendants openly represented was "conservative" and based in large part on revenue locked in under the Supply Agreement, Defendants had a duty to update investors by informing them that the 3Q18 Guidance was no longer reliable when these subsequent intervening events put AOI off course.

15.     Defendants, however, disregarded their duty.  Instead of updating their August 7, 2018 statements when AOI elected to stop shipments to Facebook—thereby halting all revenue under the Supply Agreement—Defendants concealed the truth.  Providing the required update to investors would have confirmed the market's deepest fear: AOI was not equipped to satisfy Facebook's demand or to compete and maintain its critical market share in the transceiver space; and it would not meet the 3Q18 Guidance or 100G volume promise Defendants shared with investors on August 7, 2018.

16.     The true state of affairs with AOI's quality control issue and deteriorating revenue under the Supply Agreement only began to come to light on September 27, 2018, and only after certain securities analysts shocked the market by issuing reports disclosing, among other things, that AOI was "having product quality issues in 100G CWDM4 transceivers" and that "the quality concerns could result in market share loss."

17.     These analysts' reports forced Defendants to publicly address the conceded internal issues these market commentators had finally exposed.  In this regard, Defendants revealed to the market the next morning (September 28, 2018) that since issuing the 3Q18 Guidance, they had: (i) identified a product quality issue; (ii) curtailed all shipments and sales of 100G products to Facebook for an undisclosed time; and (iii) launched and completed an "investigation."  With the end of the quarter rapidly approaching, Defendants were forced to dramatically revise down the Company's 3Q18 Guidance by *approximately $30 million, or more than 33%*.

18.     The market would later learn that the undisclosed chip problem had caused a shortfall of *at least $35 million* in third quarter revenue from the expected "minimum $125 million" in revenue for 2018 from the Supply Agreement.

## II.     JURISDICTION AND VENUE

19.     Plaintiffs' claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of Defendants' actions, and the subsequent damages, took place within this District.  In addition, AOI's principal executive offices are located in this District.

21.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

22.     Lead Plaintiff Mark Naglich is an individual who resides in Pueblo West, Colorado. As reflected in the Certification attached as Exhibit A, Mr. Naglich purchased or otherwise acquired AOI's securities during the Class Period and has been damaged as a result of the conduct complained of herein.

23.     Additional Plaintiff Rick Fasnacht is an individual who resides in Marana, Arizona. As reflected in the Certification attached as Exhibit B, Mr. Fasnacht purchased or otherwise acquired AOI's securities during the Class Period and has been damaged as a result of the conduct complained of herein.

### B.    Defendants

24.     Defendant Applied Optoelectronics is incorporated under the laws of Delaware.  Its principal executive offices are located at 13139 Jess Pirtle Blvd., Sugar Land, TX 77478.  AOI's securities trade on the NASDAQ exchange.   The Company's common stock trades under the symbol "AAOI."

25.     Defendant Lin was the President and Chief Executive Officer of AOI throughout the Class Period, and has held those titles since he founded AOI in 1997.  Lin has also served as the Chairman of AOI's Board of Directors since January 2014, shortly after he took the Company public at the end of 2013.  During the Class Period, Lin certified AOI's periodic financial reports

filed with the SEC, spoke with investors and securities analysts regarding the Company, and was responsible for the day-to-day management of AOI.

26.     Defendant Murry was the Chief Financial Officer and Chief Strategy Officer of AOI throughout the Class Period, and has held those positions since August 2014 and December 2012, respectively.  During the Class Period, Murry certified AOI's periodic financial reports filed with the SEC, spoke with investors and securities analysts regarding the Company, and was responsible for the day-to-day management of AOI.

## IV.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     AOI's Operations

27.     AOI represents that it uses a "vertical integration" strategy to design and manufacture a range of optical communications products.  Generally speaking, an optical communication product uses light to carry information through electronic devices.

28.     The Company's products include advanced optical devices, packaged optical components, optical subsystems, laser transmitters, and fiber-optic transceivers, which are then used in fiber-optic communications equipment, point-to-point telecom, datacom and access networks, and systems supporting cable television network infrastructure.

29.     The markets into which AOI sells its products are "highly competitive."  To differentiate itself, the Company hails its vertical integration capabilities and strategy as "a significant factor in our success [that] sets us apart from the competition."  To that end, AOI purports to have the "unique capability to control all aspects of the production process ensuring the highest quality, shortest lead-times, lowest price, and quickest response to customized requests available in the industry."

30.     AOI's representations concerning its "vertically integrated" process are intended to convey to investors that the Company controls in-house the manufacturing process for its optical

communications products, and it manufactures most of the small pieces that it uses to create its more complex products.  This dynamic, according to AOI, enables it to "support high volume production and timely delivery for our customers around the world."

31.     AOI has three major locations: (i) Sugar Land, Texas, where it manufacturers laser chips, subassemblies, and components; (ii) Ningbo, China, where it manufactures labor-intensive components and optical equipment systems; and (iii) New Taipei City, Taiwan, where it manufactures optical components and subassemblies.

32.     During the Class Period, AOI served four primary end-markets: (i) internet data centers, discussed below; (ii) cable television, for which AOI supplied lasers, transmitters, receivers, and turn-key equipment to customers; (iii) fiber-to-home, for which AOI supplied internet service providers with technology to deliver bandwidth to homes; and (iv) telecommunications, for which AOI supplied optical products for signal transmission.

**B.      AOI's Data Center Segment Is the Core of the Company's Business, and Provides the Vast Majority of Its Revenue**

33.     During the Class Period, the data center segment was AOI's "largest and fastest growing market," according to the Company.  Recently, revenue from this market has accounted for more than 75% of the Company's total annual revenue:

| Period | Data Center Gross Revenue (in millions)[3] | Percentage of AOI's Total Revenue |
|---|---|---|
| Six months ended June 30, 2018 | $119.6 | 78.2% |
| Fiscal Year 2017 | $306.7 | 80.2% |
| Fiscal Year 2016 | $201.3 | 77.2% |

34.     In its public filings, AOI identifies Facebook, Amazon, and Microsoft as "key customers in the data center market."  In 2016 and 2017, Facebook accounted for 3.6% and 28.6% of AOI's revenue, Amazon accounted for 54.6% and 35.4%, and Microsoft accounted for 18.3%

---

[3] Figures in this chart are rounded to the nearest tenth or tenth of a percentage.

and 13.8%, respectively.  These figures illustrate the significant customer concentration risk to which AOI is exposed.

35.     In its data center business, AOI supplies its customers with optical transceivers, which are devices that use fiber-optic technology to send and receive data, i.e., they facilitate high-speed communication within a data center's servers.

36.     Most of AOI's transceivers are plugged into switches and computer servers within hyper scale data centers, which store, process, and communicate massive amounts of data.  Via their data centers, websites (like Facebook) or "cloud computing" services (provided by companies like Amazon and Microsoft, either for their own applications or to other businesses) transmit data through network connections (i.e., fiber-optic cables) to internet service providers.

37.     To support greater bandwidth (i.e., the amount of data that can be sent or received from one point to another in a certain period of time), a data center must increase in physical size and accelerate its data transmission rates.  Those rates cannot surpass the speed limits of the data center's optical transceivers.  As a result, transceiver speed must increase to enable increased bandwidth and communication speed.

38.     By the start of 2018, 100G transceivers had become the new industry standard—replacing 40G transceivers—and investors closely monitored 100G shipments and shipment projections from AOI and its competitors, as well as the Company's customer mix.

39.     In addition to speed, another way to classify transceivers is by their corresponding network architecture—an important consideration in the market's evaluation of AOI's performance and prospects.  In this Action, the relevant architecture is CWDM, which was quickly replacing its predecessor PSM architecture.  The pertinent difference between CWDM and PSM

transceivers is the amount of fiber and cable that each requires.  Requiring less of both, CWDM transceivers allow large data center customers to cut costs of long-range transfers.

40.     Prior to the Class Period, Defendants made repeated representations to investors concerning AOI's successful transition from PSM transceivers to the more "attractive" CWDM counterparts, as well as AOI's superior position to complete that transition.  Specifically, AOI held out CWDM as "the product of choice," projecting a "longer-term trend [] for CWDM to predominate," as "customers [] turn[] more towards the CWDM . . . product[s]," and "CWDM is likely to become more important to customers in the future."  "[F]or AOI, CWDM products generally have higher gross margins."  Therefore, they are more attractive to investors assessing AOI's financial prospects.

41.     Similarly, Defendants assured investors that AOI was "very well positioned in this market for CWDM," claiming its "transceiver products feature AOI lasers with superior performance and excellent reliability."  Specifically, AOI represented that:

> The majority of the data center optical transceivers that we sell utilize our own lasers and subassemblies (we refer to the transceivers subassemblies as "light engines"), and we believe that our in-house technology and manufacturing capability for these lasers and subassemblies gives us an advantage over many of our competitors who often lack either development or manufacturing capabilities for these advanced optical modules.

42.     Based on those capabilities, AOI touted that it expected to be a major player in the CWDM space:



**C.     The Market Doubts AOI's Ability to Keep Pace in the 100G Space**

43.     In late 2017 and early 2018, on the heels of several disappointing quarters and changing customer preferences for transceivers, AOI faced increased market scrutiny related to its ability to generate and maintain market share in the "highly competitive" data center market, particularly for 100G CWDM transceivers (and component parts).  Prior to and during the Class Period, AOI's primary competitors include publicly traded companies Oclaro, Inc. ("OCLR"), Intel Corp. ("INTC"), Lumentum Holdings Inc. ("LITE"), Finistar Corp. ("FNSR"), and Luxtera, Inc. (a private company).

44.     The market's scrutiny, in part, arose from AOI's prior struggles to ramp up production of 100G hardware fast enough to meet demand from data center giant, Amazon. Specifically, in the second half of 2017, AOI experienced steep declines in revenue from Amazon when Amazon elected to move away from 40G transceivers in favor of 100G transceivers, and AOI could not satisfy Amazon's demand.

45.     As a result, heading into 2018, investors feared that a similar inability would again befall AOI as the market moved from 100G PSM to 100G CWDM.  Based upon this concern, doubt in the market existed as to whether AOI could, in fact, make this transition and keep pace with its competitors.

46.     For example, in a November 8, 2017 report entitled "AAOI: 100G Declines, Headwinds Persist," analyst BWS Financial Inc. concluded that "[e]ntering the fourth quarter we have a high level of conviction AAOI is facing fierce competition from Intel (INTC) and has lost share at FB."  Likewise, in January 2018, an analyst from Rosenblatt Securities repeated that AOI may be losing share to InnoLight Technology Ltd. at Facebook.

47.     Then, in a February 13, 2018 report issued prior to AOI's 4Q17 earnings release, entitled "4Q/2018 Preview:  Data Center Headwinds from Competition and Architecture Changes . . . Lowering Estimates and Price Target, Maintaining HOLD Rating," analyst firm Craig-Hallum Capital Group LLC stated:

> Competition on 100G CWDM-lite appears to strengthen: Our checks indicate AAOI is seeing increased competition at FB (#1 customer in 3Q), coming from INTC and Innolight.  ***While we believe volumes are increased at FB overall, we think AAOI's share may be declining***.  We understand INTC is being very aggressive on pricing, and Innolight is gaining share.  FB was 37% of sales last quarter with the lion's share from 100G CWDM-lite.

**D.     Defendants Announce and Tout as Lucrative the Supply Agreement with Facebook for CWDM Products, Easing Investors' Concerns**

48.     As analysts' concerns and doubts were piling up, on February 21, 2018, AOI formally announced the new Supply Agreement with Facebook and an accompanying Master Purchase Agreement by filing partially redacted versions of the agreements with the SEC on Form 8-K.  Under the Supply Agreement, Facebook agreed to a minimum purchase volume of optical communications products for 2018, and to provide demand forecasts to make additional purchases for 2019 and 2020.  On behalf of AOI, both Agreements were signed by Fred Chang, Senior Vice

President of the Optical Component Business Unit and General Manager for North America, who reported to Defendant Lin.

49.     Notably, in its public filing, AOI did not disclose the specific product or product family that Facebook had agreed to purchase—such information either was not included in or was heavily redacted by AOI in the versions of the Agreements that it filed with the SEC.  The market, nevertheless, understood that Facebook was purchasing 100G CWDM transceivers.  ¶¶ 46-47, 54, 64.

50.     Similarly, AOI did not disclose the timing of its shipments of transceivers to Facebook.  Under the Supply Agreement, AOI supplied product to Facebook according to a confidential deployment schedule, the dates of which were in a redacted "Table 1" in the Company's Form 8-K attaching the redacted Supply Agreement.  Individual shipment dates, also confidential, were order-specific.  Also redacted was the length of Facebook's "Testing Period"— the time window for Facebook to assess AOI's shipments for defects upon delivery.

51.     Upon annoucing the Supply Agreement, Defendants proclaimed that the three-year deal brought to AOI a demand minimum that would provide at least *$125 million* in revenue for 2018, alone.  The Company would book that revenue, recognizing it at the time of shipment, through a steady stream of individual orders and with the safety of purchase commitments.

52.     In addition to the committed minimum, according to Defendant Murry, the deal brought with it "opportunities to take additional share" of Facebook's demand:

> [A]nd I mentioned earlier and in the 8-K that it is a minimum commitment.  This is how we operate with some of our other customers as well, in the sense that AOI, typically gets a share oftentimes a leading share with our customers.  As sort of a minimum commitment, but often times, depending on what competitors can actually produce and ship in a given quarter, we may have opportunities to take additional share.

14

53.     While the market reacted negatively to AOI's financial results and shortfalls that quarter, investors were encouraged by AOI's announcement of the Supply Agreement.  For example, that same day, Piper Jaffray reported "AAOI did announce a 3-year deal with Facebook which includes at least $125M in revenue in 2018 which we believe to be mostly 100G transceivers and should help with some stability for that product segment."  The Piper Jaffray report further noted that the "$125 million will be spread over 4 quarters, but management said it will be back-end-loaded"—i.e., with the majority to come during the second half of 2018.

54.     The next day, on February 22, 2018, Cowen Equity Research reported that the Supply Agreement was a "positive note" that spoke to "AAOI's strong competitive position and the incremental opportunity presented for AAOI by Cloud Titans."  In this report, Cowen concluded: "***We view this announcement [of the Supply Agreement] as especially notable given that many investors appear to have believed that AAOI was being significantly displaced at FB—by INTC in particular***."

55.     As this contemporaneous market commentary shows, the market understood from Defendants' statements that the Supply Agreement:  (i) was a strong indicator that AOI had established (or re-established) solid footing in the industry, particularly for 100G CWDM transceivers; and (ii) would drive performance for AOI over the course of 2018 (and beyond).

**E.     Defendants Represent that the Company Will Double 100G Volumes in the Second Half of 2018**

56.     On May 8, 2018, AOI issued a press release announcing the Company's first quarter 2018 financial results and held a conference call to discuss those results after the close of trading that day.  During this call, Defendant Lin informed investors that AOI expected "100G volumes to more than double in the second half of the year over the first half as we deliver on the committed orders we announced last quarter."

57.     Importantly, AOI's ability to double volumes, as Defendant Lin represented, required AOI to produce and maintain an adequate "yield" to supply Facebook's minimum purchase commitment under the Supply Agreement.  In this context, yield refers to the percentage of total products AOI manufactured that function properly, and correlates directly with profitability and margins, as well as the Company's abilities to satisfy existing demand and to replace defective product that has already shipped.

58.     Analysts were quick to seize on Defendants' representations that unit sales of 100G products would more than double in the second half of 2018, as well as the promised revenue from the Supply Agreement.  For example, in a report entitled "1Q18: Ongoing Near-Term Issues But Longer Term Outlook Remains Bright," dated May 9, 2018, Cowen noted, "[w]e continue to see AAOI maintaining a strong position with key DC customers and expanding into new DC customers with strong ongoing margins."

59.     With all eyes on AOI's second half of 2018 performance, the Company's ability to deliver under the Supply Agreement was of the utmost importance.  Any misstep could have led to a dramatic loss of immediate and future business from Facebook and others, irreparably harming investor confidence in AOI's ability to establish and grow a foothold in the rapidly expanding industry.

**F.      Defendants Issue Ambitious 3Q18 Guidance, and Reaffirm AOI's 100G Ramp Up in the Second Half of 2018 Based on Committed Orders from Facebook**

60.     On August 7, 2018, AOI released its second quarter 2018 results.  In announcing earnings, Defendant Lin highlighted the successes of AOI's data center business:  "We are pleased with our second quarter results, which were driven by increased demand for our market-leading datacenter products."

61.     That same day, Defendants issued the following financial guidance for 3Q18: (i) "[r]evenue in the range of $82 million to $92 million"; (ii) "[n]on-GAAP gross margin in the range of 40.0% to 41.5%"; (iii) "[n]on-GAAP net income in the range of $11.1 million to $15.2 million"; and (iv) "non-GAAP fully diluted earnings per share in the range of $0.54 to $0.75 using approximately 20.4 million shares."

62.     Defendant Murry represented to investors that the Company's strong 3Q18 Guidance was supported by AOI's "more than double" expected 100G volumes in the second half of 2018, "based largely on the committed orders we announced in Q1 of this year" under the Supply Agreement.

63.     Murry concurrently assured investors that the 3Q18 Guidance was "conservative," and rejected any notion that there was, at that time, anything "extraordinary" impacting the Company and its 3Q18 Guidance.  In this regard, he stated:  "I think we're attending to try to encompass the range of possibilities that we see out there, and I guess you could say that's more conservative, sure."

64.     In an exchange with another analyst, Defendant Murry reaffirmed the Company's expectation that CWDM products like those AOI was selling to Facebook would "predominate" over older 100G models and "would probably take even greater share."  To that end, Murry added, "that's what we're seeing and I don't expect that to change."

65.     The market reacted favorably to AOI's "conservative" 3Q18 Guidance.  For example, Elazar Advisors, LLC issued a report with a "Buy" rating for AOI, noting: "So you have Facebook and Amazon that are both gunning to be AO[I]'s number one customer.  That's something new that I don't recall in a while, or maybe ever."  Elazar also specifically honed in on Defendant Murry's statement that AOI's 3Q Guidance was "conservative," stating, ***"[t]hey [AOI]***

*even admitted on the call that they are being more conservative than usual.  I thought that was just so huge to hear them say.  I was surprised to hear that from a CFO*."

66.     Similarly, Cowen issued a same-day report entitled "2Q18: Outlook Continues to Improve," in which Cowen increased its 12-month per share price target from $42 to $53, explaining "[w]e have tweaked our forecasts and price target and continue to see highly compelling risk-reward in shares.  *We expect growth and profitability to continue to exceed Street expectations driven by ongoing strong growth from FB*," among other positive factors.  Cowen specifically noted that "*AAOI expressed confidence, on the basis of ongoing customer indications, in doubling 100G unit volume growth in 2H18 over 1H18*."

**G.     Behind the Scenes, a Product Defect in the 100G CWDM Transceivers Leads AOI to Stop Shipments to Facebook, and the Company's Revenue Craters**

67.     For Defendants, the hype was short-lived.  Soon after AOI issued its 3Q18 Guidance, the Company's prospect of meeting it swung from "conservative" to impossible.  Specifically, unknown to investors, Defendants soon learned of a defect in the 25G laser chip, which rendered defective the transceivers AOI had sold and was planning to sell to Facebook under the Supply Agreement (which formed the primary basis for Defendants' 3Q18 Guidance).

68.     Faced with this cripping quality control issue—and with insufficient yeild on hand to replace the defective transceivers—Defendants suspended *all* shipments of purportedly "committed orders" to Facebook and authorized an internal investigation into the defect.  As the Company would later admit, the halt on shipments remained in place during the entirey of AOI's undisclosed internal investigation and damage control with Facebook.

69.     Given the importance of these "committed orders" and the corresponding revenue to AOI's bottom line, Defendants knew (or, at a minimum, were reckless in disregarding) that their deliberate decision to suspend product shipments to Facebook under the Supply Agreement would

hamstring third quarter revenue.  Indeed, Defendants had represented that the 3Q18 Guidance was anchored by revenue from shipments purportedly locked in under the Supply Agreement.  Thus, at the moment Defendants elected to cease shipping product to Facebook, they knew that their 3Q18 Guidance—very much alive in the minds of investors—became unobtainable, and thus, materially misleading.

70.     Despite the immediate and irreversible damage that these internal issues caused to AOI's revenue stream, Defendants deliberately delayed updating their August 7, 2018, statements, concealing each of the material facts identified herein.  By doing so, Defendants violated their duty to update the 3Q18 Guidance that arose when they suspended shipments under the Supply Agreement.

### H.      Defendants Belatedly Update AOI's Materially Misleading 3Q18 Guidance

71.     With just days remaining in the third quarter of 2018, the truth about AOI's operations began to emerge on September 27, 2018, when market commentators, including Loop Capital Markets and financial media outlet Benzinga.com, issued reports revealing the hidden product quality issues in AOI's 100G CWDM transceivers.  According to these reports, AOI's "product quality issues" impacted its sales to Facebook, and "could result in market share loss."

72.     Before the market opened on September 28, 2018, AOI was forced to reveal the truth to investors.  Specifically, AOI issued a press release entitled "Applied Optoelectronics Updates Third Quarter 2018 Revenue Guidance."  That release confirmed that AOI had, in fact, identified and investigated product quality issues with the 25G lasers, and that the Company's suspenson of shipments of the transceivers utilizing those lasers would result in substantially lower revenue than the 3Q18 Guidance had led investors to expect:

> "During the third quarter, we identified an issue with a small percentage of 25G lasers within a specific customer environment.  Consistent with AOI's commitment to supreme product quality and customer support, *we mutually agreed with the*

*customer to temporarily suspend shipments of certain transceivers utilizing these lasers while we worked to gain a deeper understanding of the scope of the issue and implement a solution*.  We have since determined that less than one percent of these lasers were subject to this issue, we have enacted a solution and with the agreement of the customer, resumed shipments," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO.

****

"*Outside of the temporary delay in shipments that impacted our third quarter revenue*, sales and shipments as well as the pricing environment were consistent with our prior expectations."

73.     As a result of Defendants' previously undisclosed decision to stop shipping AOI's 100G CWDM transceivers to Facebook, the Company dramatically lowered its 3Q18 Guidance by tens of millions of dollars:

Applied Optoelectronics currently expects revenue for its third quarter 2018 to be between $55 million and $58 million, below the company's previous guidance of $82 million to $92 million.  The company will report detailed third quarter financial results and host a conference call on Nov. 7, 2018.

74.     Contemporanous market commentary reveals that analysts were surprised by both the nature and timing of the previously undisclosed quality issues and Defendants' suspension of shipments in light of AOI's prior positive statements.  For example, Craig-Hallum noted in a September 28, 2018 report that, by the time AOI elected to make its disclosure, "it identified an issue with the 25G lasers and stopped shipment during the quarter, then identified and fixed the problem and resumed shipments during [the] quarter."  That same day, Northland Capital Markets noted that, among the myriad "risks in the 100G Cloud datacom market" it had identified, "25G laser product quality at AAOI was not among them."  Cowen also specifically called out the newly disclosed issues with AOI's "fully vertically integrated manufacturing model," lowering not only its guidance for AOI's third quarter, but also its "4Q18 and CY19-20 revenue forecasts entirely driven by reductions in our FB and 100G revenue forecasts."

## I.    Post-Class Period Events

75.    On November 7, 2018, Defendants confirmed that their decision to halt shipments to Facebook based upon issues with the manufacturing and quality of the 25G lasers within the 100G transceivers directly "resulted in softer-than-expected datacenter revenue of $39 million." Specifically,  Defendant Lin stated:

> [A]n issue we identified with a small percentage of 25G lasers, which led to a temporary delay in 1 of digital receiver shipments to a datacenter customer.  As we work to troubleshoot the issues, we enact a solution quickly and with agreement of data customer, resumed shipments.  ***The delay, however, resulted in softer-than expected datacenter revenue of $39 million***.   We continue to have active engagement with this customer and believe we have a solid relationship.

76.    Defendant Murry likewise conceded that the "issue" that AOI had to "troubleshoot" for the data center customer (i.e., Facebook) was a "quality issue" that prevented AOI from "complet[ing] the manufacturing process" for certain goods during the quarter.  He also alerted investors that AOI would suffer decreased production capacity and increased costs in the fourth quarter due to:

> [A]dditional product testing sets that we have implemented in order to further reassure our customer base that we have eliminated any potentially troublesome laser devices from our inventory, including work in process.  Most of these additional testing steps are temporary measures to screen existing inventory.  In addition to the reduced production capacity, these costs will also temporarily increase our cost of goods sold and thus negatively impact our gross margin in Q4.

77.    As a direct result of these issues, AOI slashed the 2018 revenue projection from the Supply Agreement that it had touted in February 2018 ***down $35 million, from $125 million to $90 million—a 28% cut***.

78.    Defendants also admitted that AOI's suspension of shipments due to the undisclosed "quality issue" affecting 25G laser chips in transceivers sent to data center customers had impacted nearly every measure of the Company's financial health, and, thus, its ability to hit

the 3Q18 Guidance.  Defendants have admitted that all of these facts were known before they

disclosed these issues days before the end of the quarter.

79.     Defendants' statements on November 7, 2018, illustrated the magnitude of the

concealed intervening events of AOI's performance.  In this regard, Defendants revealed that:

- Revenue of $56.4 million was ***over $24 million below AOI's originally forecasted third quarter outlook due to the suspended shipments***.

- ***Gross margin declined from 40.4% to 34%***, "primarily due to capacity under-utilization while we worked to resolve the inventory issue we experienced this quarter."

- AOI had been forced to take "***approximately $1.5 million in inventory write-downs related to the quality issue***."

- ***Operating expenses increased to 40.4% of revenue compared to 23.7% of revenue*** in the prior quarter "mostly due to higher R&D expense incurred to troubleshoot and resolve the issue we experienced in the quarter."

- "[I]t's reasonable to believe that ***some of the business [lost by AOI] went to a competitor in the quarter***."

## V.     MATERIALLY MISLEADING STATEMENTS OR OMISSIONS OF MATERIAL FACT

80.     On August 7, 2018, AOI issued a press release, filed with the SEC on Form 8-K,

announcing the Company's 2Q18 financial results, which was signed by Defendant Murry.

81.     In that press release, Defendants issued the following financial guidance for 3Q18:

(i) "[r]evenue in the range of $82 million to $92 million"; (ii) "[n]on-GAAP gross margin in the

range of 40.0% to 41.5%"; (iii) "[n]on-GAAP net income in the range of $11.1 million to $15.2

million"; and (iv) "non-GAAP fully diluted earnings per share in the range of $0.54 to $0.75 using

approximately 20.4 million shares."

82.     Defendant Murry restated the Company's 3Q18 Guidance set forth in ¶ 81 during

the Company's earnings conference call to discuss the Company's 2Q18 results and 3Q18

Guidance, held after the market closed on August 7, 2018.

83.     During that same call, Defendant Murry made the following statement concerning AOI's 100G volumes in the second half of 2018:

> [W]e continue to expect 100G volumes to more than double in the second half of this year over the first half, which is based largely on the committed orders we announced in Q1 of this year.

84.     During the call, Defendant Lin made a substantially similar statement:

> We are pleased with our results and continue started executions in the quarter as the demand environment improved.  Looking ahead, we remain encouraged by the trend we see in the market, we can nearly expect 100G volume with more than double in the second half of this year over the first half, which is based largely on a committee [sic] order we announced in Q1 of this year.

85.     The statements set forth in ¶¶ 81-84 were definite, positive projections.  They contained factual representations that remained alive in the minds of investors concerning AOI's then-existing financial prospects, as reflected in the analysts' reactions alleged above, including at ¶¶ 65-66, 74.  By electing to speak publicly about AOI's 3Q18 Guidance and the 100G volumes supporting that Guidance—thereby putting these subjects into play—Defendants had a duty to fully, completely, and truthfully disclose all material facts bearing upon these issues when Defendants made the deliberate decision to suspend shipments to Facebook due to product quality issues, which immediately imperiled AOI's revenue and 100G shipment volumes, rending their statements materially misleading.

86.     As soon as AOI ceased shipping product to Facebook under the Supply Agreement, Defendants possessed more than adequate information to provide a timely update to investors that their August 7, 2018 statements were no longer reliable.  Namely, when Defendants suspended AOI's shipments under the Supply Agreement, they knew that AOI would not earn the revenue necessary to meet the 3Q18 Guidance.

87.     Rather than informing investors that the 3Q18 Guidance could was no longer be reliable, Defendants sat idly by until securities analysts provided such information to investors on

September 27, 2018.  By that time, Defendants had already:  (i) identified the defect with the Company's 25G laser chip; (ii) suspended all shipments to Facebook of the transceivers utilizing the 25G laser chips; (iii) authorized an investigation into the defect; (iv) addressed the defect with Facebook; (v) completed the investigation; and (vi) resumed shipments to Facebook.  During the delay period, which likely would have dragged on but for the analysts' reporting on AOI's chip defect, investors continued to rely upon the materially misleading 3Q18 Guidance, which deprived investors of the ability to make informed investment decisions.

88.     By failing until September 28, 2018—the last day of the third quarter—to update the statements set forth in ¶¶ 81-84, despite Defendants' actual knowledge or reckless disregard of the material facts arising from these subsequent, intervening events, Defendants violated a duty to update their statements.

## VI.     LOSS CAUSATION

89.     Defendants' deliberate delay in updating their August 7, 2018 statements caused the prices of AOI securities to be artificially inflated and/or maintained such artificial inflation, thereby operating as a fraud or deceit upon Plaintiffs and other putative Class members who purchased or otherwise acquired AOI securities.

90.     In reliance upon the public information that Defendants disclosed on August 7, 2018, as well as the integrity of the market price for AOI securities, Plaintiffs and other putative Class members purchased or otherwise acquired AOI common stock during the Class Period at prices that were artificially inflated based upon subsequent events that rendered Defendants' August 7, 2018 statements materially misleading.  Plaintiffs and other putative Class members suffered actual economic loss and were damaged by Defendants' failure to timely update their August 7, 2018 statements when the truth that Defendants deliberately concealed was revealed through the public disclosures of new information on September 27, 2018 and September 28, 2018.

24

These partial corrective disclosures and/or materializations of the foreseeable risks concealed by Defendants' failure to timely update their August 7, 2018 statements caused foreseeable declines in the prices of AOI securities by removing portions of the artificial inflation in the prices of AOI securities that resulted from Defendants' fraud.  Moreover, the timing and magnitude of the declines in the prices of AOI securities in response to the public disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions or other macroeconomic factors unrelated to Defendants' misconduct.

91.    The truth was partially revealed on September 27, 2018, when analyst Loop Capital (through securities analyst James Kisner) downgraded AOI stock from "Hold to Sell" following the analyst's own "industry checks suggesting that: 1) AAOI is having product quality issues in 100G CWDM4 transceivers, and 2) the pricing environment for 100G data center optics remains very tough."  Loop Capital also lowered its price target by more than half, from $45 to $20.

92.    That same day, Benzinga.com provided more detailed information about how AAOI's "product quality issues" impacted its sales to Facebook:

> Applied Optoelectronics is experiencing product quality issues with its 100G CWDM4 transceivers in which its lasers fail after thousands of hours of operation, and the quality concerns could result in market share loss, [Loop Capital analyst] Kisner said in the Thursday downgrade note. . . .

> While the company could solve the problem by procuring lasers from suppliers, that move would negatively impact gross margins, the analyst said.

> Industry contacts also told Loop Capital the pricing environment for 100G CWDM4 data center optics is "very tough," Kisner said.  Further checks suggests CWDM4 average selling prices are around $250, but could dip to $200 by September of next year versus Loop's expectations for $300 in the third quarter of 2018 and $250 by the third quarter of 2019.

> While one anecdote suggested a price as low as $175, that price is likely an outlier, the analyst said.

*The concerning findings suggest Applied Optoelectronics is likely to start procuring 25G lasers externally through 2019*, Kisner said.  This warrants a decrease in 2019 gross margin expectations from 40.5 percent to 34.4 percent, along with expectations for lower revenue stemming from lower selling prices.

93.     This disclosure of new information concerning AOI directly and proximately caused a substantial decline in the price of AOI securities by removing a portion of the artificial inflation caused by Defendants' failure to timely update their August 7, 2018 statements.   In response to this information—the disclosure of which was a foreseeable consequence of, and within the zone of risk created by, Defendants' misconduct—AOI's share price fell by $2.98 per share, more than 9%, from a close of $31.34 per share on September 26, 2018 to close at $28.36 per share on September 27, 2018, on heavy trading volume.

94.     In light of the information that analysts reported on September 27, 2018, Defendants could no longer conceal the adverse facts that had rendered their August 7, 2018 statements misleading.   Accordingly, before the market opened on September 28, 2018, AOI issued a press release filed with the SEC on Form 8-K entitled "Applied Optoelectronics Updates Third Quarter 2018 Revenue Guidance."

95.     AOI confirmed in this press release that the Company had suspended shipments to Facebook based upon product quality issues that AOI had previously identified, which had materially depressed the Company's 3Q18 revenue:

> "During the third quarter, we identified an issue with a small percentage of 25G lasers within a specific customer environment.  Consistent with AOI's commitment to supreme product quality and customer support, *we mutually agreed with the customer to temporarily suspend shipments of certain transceivers utilizing these lasers while we worked to gain a deeper understanding of the scope of the issue and implement a solution.*  We have since determined that less than one percent of these lasers were subject to this issue, we have enacted a solution and with the agreement of the customer, resumed shipments," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO.

****

"***Outside of the temporary delay in shipments that impacted our third quarter revenue, sales and shipments as well as the pricing environment were consistent with our prior expectations***."

96.    As a result of this production issue that led Defendants to suspend shipments to Facebook, the Company lowered dramatically its 3Q18 Guidance by tens of millions of dollars:

> Applied Optoelectronics currently expects revenue for its third quarter 2018 to be between $55 million and $58 million, below the company's previous guidance of $82 million to $92 million.  The company will report detailed third quarter financial results and host a conference call on Nov. 7, 2018.

97.    As a direct and proximate result of this corrective disclosure and/or materialization of the foreseeable risks concealed by Defendants' failure to timely update their August 7, 2018 statements, AOI's share price fell by $3.70 per share, more than 13%, to close at $24.66 per share on September 28, 2018, on unusually high trading volume.

98.    Analysts reacted quickly to AOI's disclosures and the resulting impact on the Company's financial health and prospects in the data center market.  The same day, Northland stated that "given the highly competitive environment at FB and elsewhere[,] AAOI is in danger of share loss to INTC and Innolight," stressing that AOI's quality control problems could strengthen the competitive position of other market participants, including MACOM Technology Solutions ("MTSI"):

> Given that internal control over the laser/manufacturing processes has been one of the main selling points for vertical integration, we believe AAOI[']s continued struggles make the emerging outsource/whitebox model ramping at MTSI in 2H18 more attractive to Cloud providers.  We also believe these issues put a premium of 25G datacom laser quality with OCLR at the top of the pack from a merchant standpoint and one of several reasons to own LITE at current levels heading out of the show.

99.    Northland added that, despite the myriad "risks in the 100G Cloud datacom market" it had identified, "25G laser product quality at AAOI was not among them."

100.    Other analysts were similarly taken aback by the sudden shift in guidance.   On September 28, 2018, Cowen lowered not only its 3Q18 Guidance, but also its "4Q18 and CY19-20 revenue forecasts entirely driven by reductions in our FB and 100G revenue forecasts":

> We also have reduced our 3Q18 gross and operating margin forecasts given AAOI's fully vertically integrated manufacturing model and attending likely adverse impact of the revenue shortfall.  We have decreased our total revenue and PF (ex-ESC) EPS forecasts as follows: CY18 by ($47M)/($0.78) to $300M/$1.75; CY19 by ($11M)/($0.10) to $405M/$3.53; and CY20 by ($13M)/($0.12) to $449M/$4.03.  Our decreased Data Center transceiver revenue forecast drives all of our decreased total revenue forecast.

101.    Also on September 28, 2018, Piper Jaffray reiterated its "neutral" rating for AOI based, in part, upon its belief that the laser chip issue "was a company specific quality problem" that threatened the Company's market share with Facebook (and others), stating:

> Applied has built a solid business with industry leading margins supplying quality optical transceivers to customers like Facebook and Amazon, but *we have recently been neutral on the stock given the high degree of customer concentration risk and these results exemplify these concerns*.

102.    Defendants' failure to timely update their August 7, 2018 statements caused the prices of AOI securities to be artificially inflated, and/or maintain such artificial inflation. Plaintiffs and other Class members purchased or otherwise acquired AOI securities at prices that were artificially inflated as a result of Defendants' misconduct.

103.    Defendants' wrongful conduct directly and proximately caused the damages suffered by Plaintiffs and other Class members by creating and/or maintaining artificial inflation in the prices of AOI securities.   Had the Defendants timely disclosed complete, accurate, and truthful information, Plaintiffs and other Class members would not have purchased or otherwise acquired AOI securities at the artificially inflated prices that they paid.  It was entirely foreseeable to Defendants that failing to timely update their August 7, 2018 statements would cause the prices of AOI securities to be artificially inflated.  It was also foreseeable that the ultimate disclosure of

this information, and/or the materialization of the risks concealed by Defendants, would cause the price of AOI securities to decline, as the artificial inflation resulting from Defendants' failure to timely update their August 7, 2018 statements was removed from the prices of AOI securities.

104.    Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and to the other Class members.

105.    The economic losses, i.e., damages, suffered by Plaintiffs and the other Class members are direct and foreseeable results of:  (i) Defendants' failure to timely update their August 7, 2018 statements, which caused the prices of AOI securities to be artificially inflated, and/or maintained such artificial inflation; and (ii) the subsequent significant decline in the prices of AOI securities when the truth was gradually revealed and/or the risks previously concealed by Defendants materialized on September 27, 2018 and September 28, 2018, removing portions of the artificial inflation from the prices of AOI securities.

## VII.    SUMMARY OF DEFENDANTS' SCIENTER

106.    The Individual Defendants acted with scienter because they knew or recklessly disregarded that the public statements set forth in ¶¶ 81-84 above were rendered materially misleading by subsequent, undisclosed material events.   The Individual Defendants also knowingly or recklessly participated or acquiesced in the failure to update those statements. Among the specific facts alleged above, Defendants' scienter is evidenced by the following facts:

107.    *First*, Defendants' knowledge of and intentional delay in updating the August 7, 2018 statements—and corresponding failure to disclose material facts that adversely affected the 3Q18 Guidance, all of which they have conceded were known or accessible to them prior to September 28, 2018—is strong evidence of scienter.  The importance of the Supply Agreement and Defendants' decision to make specific statements on August 7, 2018 based upon that Agreement only bolster this already strong inference of scienter.

108.  *Second*, Defendant Lin was financially motivated to commit securities fraud, and realized substantial financial benefits from his personal sales of AOI stock after Defendants issued their August 7, 2018 statements.  As a corporate insider in possession of material, adverse, nonpublic information concerning the Company's chip defects, suspension of shipments to Facebook, and the 3Q18 Guidance (and performance overall), among other relevant facts, Lin was required to either disclose that information or abstain from trading.  Lin did neither.  Instead, after exercising options that would not have expired until September 26, 2023, in two transactions, Lin sold a total of *37,471 shares*, for proceeds of approximately *$1,596,886.90*, between August 14, 2018 and August 27, 2018.  On those sales, Lin profited approximately *$1,223,675.72*.

109.  *Third*, the alleged fraud concerns the core of the Company's operations and its primary market.  AOI's sales of 100G transceivers to the data center market makes up the majority of its data center revenue, which in turn accounts for more than 75% of the Company's total revenue.  In that respect, AOI's performance in the data center market, particularly with regard to 100G CWDM transceivers and its sales to Facebook, was one of the Company's most closely-watched metrics during the Class Period.  The importance of the Supply Agreement to AOI's business and revenue raises a strong inference that the Individual Defendants either knew, or were reckless in disregarding that their statements had become misleading and required updating.

110.  Moreover, AOI's performance under the Supply Agreement represented AOI's first major opportunity to herald AOI's transition to 100G CWDM transceivers, the manufacture of which, according to Defendants, allowed AOI to tap more deeply into its vertical integration advantage.  For that reason, exposing the chip defect and shipment suspension in AOI's 100G CWDM transceivers would have soured the market's reception of the transition.  Because AOI had poised itself to rely on that transition's success for future revenue and to retain its market

share, AOI refrained from timely updating investors on critical facts about AOI's performance under the Supply Agreement—AOI's keystone deal for 100G CWDM transceivers.  AOI was also financially motivated to conceal from investors Facebook's suspension and/or return of shipments of AOI's transceivers, caused, at least in part, by Facebook's discovery of the defect in AOI's laser chips—one known (or which should have been known) to Defendants.

111.    *Fourth*, the Individual Defendants controlled the contents of the Company's public statements, including the 3Q18 Guidance, and were responsible for the accuracy of AOI's corporate statements.   On quarterly conference calls, both Lin and Murry discussed with investors—in detail—the intricacies of AOI's financial performance.   They also certified the Company's financial reports filed with the SEC.   Because of their high-level positions, each Individual Defendant was provided with, or had access to, information revealing the product defect and corresponding suspension of shipments.   Therefore, each is responsible and liable for failing to timely update AOI investors.

## VIII.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

112.    At all relevant times, the markets for AOI securities were open and efficient for the following reasons, among others:  (i) AOI common stock met the requirements for listing, and was listed and actively traded on the NASDAQ under the ticker symbol "AAOI"; (ii) as a registered and regulated issuer of securities, AOI filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) AOI regularly communicated with investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) AOI was followed by numerous securities analysts employed by major brokerage firms, including Craig-Hallum, Piper Jaffray,

Cowen, and Northland, who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; (v) the materially misleading statements or omissions alleged herein would tend to induce a reasonable investor to misjudge the values of AOI's securities; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiffs and other Class members purchased or otherwise acquired AOI securities between the time Defendants' duty to update their August 7, 2018 statements arose and the time the truth was revealed, during which period the prices of AOI's securities were artificially inflated by Defendants' failure to timely update those statements.

113.    The market for AOI securities therefore promptly digested current information regarding AOI from all publicly available sources, and the prices of AOI's securities reflected such information.  Because Defendants failed to timely update their August 7, 2018 statements when they became materially misleading, AOI securities traded at prices above their true value. Plaintiffs and other the Class members relied upon the integrity of the AOI securities' market prices and other market information relating to AOI.

114.    Under these circumstances, Plaintiffs and other Class members, as purchasers or acquirers of AOI securities at artificially-inflated prices, suffered similar injuries, and a presumption of reliance under the fraud-on-the-market doctrine applies.

115.    Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to timely disclose material information as required by law.  Plaintiffs and other Class members would not have purchased or otherwise acquired AOI securities at artificially inflated prices if Defendants had timely disclosed all material information as required by law.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the

Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

116. The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially misleading statements alleged herein.

117. Such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.

118. To the extent that the statutory safe harbor applies to any materially misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially misleading forward-looking statement because, at the time the duty to update such statement arose, the speaker actually knew that the statement had become materially misleading.

## X. CLASS ACTION ALLEGATIONS

119. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of themselves and all other persons and entities that purchased or otherwise acquired the publicly traded securities of AOI during the Class Period.

120. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of AOI, members of AOI's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of AOI.

121.     The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, AOI's securities were actively traded on the NASDAQ.  While the exact number of Class members is currently unknown to Plaintiffs and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class.  Class members may be identified from records maintained by AOI or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

122.     Plaintiffs' claims are typical of the claims of the other Class members, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

123.     Plaintiffs will fairly and adequately protect the interests of the Class members, and have retained counsel competent and experienced in class and securities litigation.

124.     Common questions of law and fact exist as to all Class members.  Those common questions predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:  (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants failed to timely update their August 7, 2018 statements; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of damages.

125.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress

individually the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## XI.    CAUSES OF ACTION

<u>**COUNT I**</u>
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against all Defendants**

126.    Plaintiffs incorporate by reference and re-allege all preceding paragraphs as if fully set forth herein.  This claim is brought against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

127.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make the statements that became materially misleading, as alleged herein, which:  (i) deceived the investing public; (ii) caused the market price of AOI securities to trade above their true value; and (iii) caused Plaintiffs and other Class members to purchase or otherwise acquire AOI securities at artificially inflated prices.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

128.    While in possession of material adverse, non-public information, Defendants, individually and in concert, directly or indirectly, by using means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's securities, including Plaintiffs, in an effort to maintain artificially high market prices for AOI's securities, in violation of Section 10(b) and Rule 10b-5.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

129.     Defendants had a duty to disclose information required to update their August 7, 2018 statements that had become materially misleading as a result of undisclosed, subsequent intervening events.  Defendants also had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information about the Company's operations, so that the market prices of AOI's securities would be based on truthful, complete, and accurate information.

130.     During the Class Period, Defendants failed to timely update the statements specified herein that they knew or recklessly disregarded were rendered materially misleading by undisclosed, subsequent, intervening events.  Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were known or readily available to them.

131.     As alleged above, Defendants' failure to update information that had become materially misleading and disclose material facts artificially inflated or maintained artificial inflation already present in the market prices of AOI securities during the Class Period.  Relying directly or indirectly upon the materially misleading statements made by Defendants, the efficiency and integrity of the markets in which the Company's securities trade, and upon Defendants' failure to disclose material adverse information that was known to or recklessly disregarded by them, Plaintiffs and other Class members purchased or otherwise acquired AOI securities at artificially inflated prices.  As the previously misrepresented and/or concealed material facts eventually emerged, the prices of AOI securities substantially declined, causing losses to Plaintiffs and other Class members.  Both the relative declines and the preceding disclosures are set forth above in ¶¶ 91-97.

132.    When Defendants' August 7, 2018 statements became materially misleading and unreliable, Plaintiffs and other Class members were unaware of their falsity and believed them to be true.  Had Plaintiffs and other Class members known the relevant truth regarding AOI's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiffs and other Class members would not have purchased or otherwise acquired AOI securities at artificially-inflated prices.

133.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages.

### COUNT II
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

134.    Plaintiffs incorporate by reference and re-allege all preceding paragraphs as if fully set forth herein.  Plaintiffs bring this claim against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

135.    Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning AOI, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

136.    In their respective roles, the Individual Defendants had regular access to non-public information about AOI's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of AOI's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

37

137.    Each of the Individual Defendants was a controlling person of AOI within the meaning of Section 20(a), as alleged herein.  By virtue of their high-level positions, participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, each of the Individual Defendants had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company.  The scope of the Individual Defendants' influence and control included the content and dissemination of the statements Plaintiffs allege were materially misleading.

138.    The Individual Defendants made the August 7, 2018 statements.  Therefore, they had both the ability and duty to update those statements when the events described above rendered them materially misleading, but failed to do so.

139.    For that reason, each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of AOI securities.  The scheme:  (i) deceived the investing public regarding AOI's operations and the true values of AOI's securities; and (ii) caused Plaintiffs and other Class members to purchase AOI securities at artificially inflated prices.

140.    The Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company.  Therefore, they had, or are presumed to have had, the power to influence and control the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

141.    As set forth above, Defendants violated Section 10(b) and Rule 10b-5 through their acts and omissions.  By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, each is liable

pursuant to Section 20(a).  As a direct and proximate result of the Individual Defendants' culpable

conduct, Plaintiffs and other Class members suffered damages.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

1.      Awarding compensatory damages against all Defendants, jointly and severally, for

all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon, as allowed by law;

2.      Awarding extraordinary, equitable, and/or injunctive relief, as permitted by law

(including rescission);

3.      Awarding Plaintiffs their costs and expenses incurred in this Action, including

reasonable counsel fees and expert fees; and

4.      Awarding such other and further relief as may be just and proper.

## XIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  March 5, 2019                    Respectfully submitted,

**AJAMIE LLP**

*s/ Thomas R. Ajamie*_____
Thomas R. Ajamie, attorney-in-charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com

*Liaison Counsel for the Class*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Johnston de F. Whitman, Jr. (*admitted pro hac vice*)
Joshua A. Materese (*pro hac vice* to be filed)
Samuel C. Feldman (*pro hac vice* to be filed)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jwhitman@ktmc.com
jmaterese@ktmc.com
sfeldman@ktmc.com

*Counsel for Lead Plaintiff Mark Naglich,*
*Additional Plaintiff Rick Fasnacht, and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on March 5, 2019, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Thomas R. Ajamie*
Thomas R. Ajamie
