IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARK NAGLICH,                    §
Lead Plaintiff,                  §
                                 §
        Plaintiffs,              §
                                 §
v.                               §   CIVIL ACTION NO. H-18-3544
                                 §
APPLIED OPTOECLECTRONICS,        §
THOMPSON LIN, and                §
STEFAN J. MURRAY,                §
                                 §
        Defendants.              §

## MEMORANDUM OPINION AND ORDER

This action is brought against Applied Optoelectronics, Inc.,
("AOI"), AOI's Chief Executive Officer ("CEO") and President,
Thompson Lin ("Lin"), and AOI's Chief Financial Officer ("CFO"),
Stefan J. Murry ("Murry"), for alleged violations of §§ 10(b) and
20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C.
§§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17
C.F.R. § 240.10b-5, during a proposed class period beginning on
August 7, 2018, and ending on September 27, 2018.[1] Pending before
the court is Defendants' Motion to Dismiss Plaintiffs' Amended
Class Action Complaint ("Defendant's Motion to Dismiss") (Docket
Entry No. 40), Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss Plaintiffs' Amended Class Action
complaint which includes a request for leave to amend ("Plaintiffs'

---

[1]Amended Class Action Complaint for Violations of the Federal
Securities Laws ("ACAC"), Docket Entry No. 34, p. 1.

Memorandum in Opposition") (Docket Entry No. 49), and Reply in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint ("Defendants' Reply") (Docket Entry No. 50). For the reasons stated below, the Defendants' Motion to Dismiss will be granted.

## I. **Procedural History and Alleged Facts**

Plaintiffs initiated this action on October 1, 2018, by filing a Class Action Complaint (Docket Entry No. 1) asserting claims for violations of §10(b) and §20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.   On January 4, 2019, the court signed an Order Granting the Motion of Putative Class Member Mark Naglich for Consolidation, Appointment as Lead Plaintiff, and Approval of His Selection of Counsel and Denying the Competing Motions (Docket Entry No. 29).   Pursuant to the January 4, 2019, Order Mark Naglich was appointed lead plaintiff for this consolidated class action, and Kessler Topaz Meltzer & Check, LLP was appointed as Lead Counsel for the class.   On March 5, 2019, Lead Plaintiff and additional plaintiff Rick Fasnacht filed the ACAC (Docket Entry No. 34).

Plaintiffs allege that AOI designs and manufactures a range of communications products, used primarily by large, internet-based

data center operators such as Facebook, Amazon, and Microsoft.[2]
AOI is incorporated under the laws of Delaware, its principal
office is located in Sugar Land, Texas, and its securities trade on
the NASDAQ exchange.[3]  Plaintiffs allege that throughout the class
period defendant Lin served as AOI's President and CEO, and
defendant Murry served as AOI's CFO and Chief Strategy Officer.[4]

The ACAC alleges that

> in February 2018, Defendants formally announced . . . [a]
> purportedly lucrative new Supply Agreement.  To this end,
> they boasted to investors "a minimum commitment for the
> first year that represents, at a minimum $125 million [in
> revenue] for one product family."  To put that number in
> perspective, AOI's data center business generated
> approximately $306 million in revenue during the entirety
> of 2017, across all customers and products. . . .
> Defendants introduced the Supply Agreement as a single
> deal that, by itself, would guarantee minimum revenue
> equal to more than 40% of the Company's entire data
> center revenue for the preceding year.[5]

The ACAC alleges that

> [i]n connection with announcing the Supply Agreement,
> Defendants also proclaimed that in the second half of
> 2018, AOI planned to "more than double" volumes in 100G
> based in large part (if not entirely) on "committed
> orders" under the Supply Agreement.  Similarly,
> Defendants represented that AOI would book the lion's
> share of the minimum $125 million in 2018 revenues from
> sales to Facebook during the second half of the year.[6]

---

[2]ACAC, Docket Entry No. 34, pp. 5-6 ¶¶ 3-5.  Page numbers for
docket entries in the record refer to the pagination inserted at
the top of the page by the court's electronic filing system.

[3]Id. at 10 ¶ 24.

[4]Id. at 10-11 ¶¶ 25-26.

[5]Id. at 6 ¶ 6.

[6]Id. at 6-7 ¶ 7.

The ACAC alleges that

> [a]gainst this backdrop, on August 7, 2018, Defendants
> issued to the market what Defendant Murray characterized
> as "conservative" guidance for AOI's third quarter 2018
> performance, anchored by sales the Company claimed were
> already booked under the Supply Agreement. Among other
> things, Defendants told investors that AOI expected
> "[r]evenue in the range of $82 million to $92 million,"
> and that the 3Q18 Guidance "encompass[ed] the range of
> possibilities that we see out there."[7]

The ACAC alleges that

> [b]ehind the scenes, however, Defendants quickly learned
> that AOI could not and would not achieve its 3Q18
> Guidance.  Specifically, Defendants identified a
> debilitating issue with 25G laser chips that AOI used in
> its prized 100G CWDM transcievers — the lynchpin of the
> Supply Agreement.  The product defect was so significant
> that Defendants elected to halt all shipments of
> transceivers to Facebook while the Company scrambled to
> comprehend the problem, manufacture replacement chips and
> transcievers, and repair its relationship with Facebook.[8]

The ACAC alleged

> [g]iven the centrality of the Supply Agreement to AOI's
> 3Q18 performance, as soon as Defendants halted shipments
> to Facebook, it was obvious that AOI could not meet the
> quarterly revenue guidance (and, in turn, earnings
> figures) that Defendants provided on August 7, 2018.
> Indeed, AOI recognizes revenue as soon as it ships its
> products.  Thus, when Defendants halted shipments to
> Facebook, a hole in AOI's revenue arose immediately.  .
> . Because AOI lacked any non-defective product on hand
> with which to satisfy Facebook's demand, the Company
> could not bridge the gap or prevent it from widening.
> The revenue shortfall continued to grow unabated for the
> remainder of the quarter.
>
> Meanwhile, Defendants kept the market in the dark.
> Having chosen to publish to the market positive concrete
> guidance for AOI's 3Q18 performance, which Defendants
> openly represented was "conservative" and based in large

---

[7] Id. at 7 ¶ 10.

[8] Id. at 7–8 ¶ 12.

part on revenue locked in under the Supply Agreement, Defendants had a duty to update investors by informing them that the 3Q18 Guidance was no longer reliable when those subsequent events put AOI off course.

Defendants, however, disregarded their duty. Instead of updating their August 7, 2018 statements when AOI elected to stop shipments to Facebook — thereby halting all revenue under the Supply Agreement — Defendants concealed the truth.  Providing the required update to investors would have confirmed the market's deepest fear: AOI was not equipped to satisfy Facebook's demand or to compete and maintain its critical market share in the transceiver space; and it would not meet the 3Q18 Guidance or 100G volume promise Defendants shared with investors on August 7, 2018.[9]

The ACAC alleges that

[t]he true state of affairs with AOI's quality control issue and deteriorating revenue under the Supply Agreement only began to come to light on September 27, 2018, and only after certain securities analysts shocked the market by issuing reports disclosing, among other things, that AOI was "having product quality issues in 100G CWDM4 transceivers" and that "the quality concerns could result in market share loss."

These analysts' reports forced Defendants to publicly address the conceded internal issues these market commentators had finally exposed.  In this regard, Defendants revealed to the market the next morning (September 28, 2018) that since issuing the 3Q18 Guidance, they had: (i) identified a product quality issue; (ii) curtailed all shipments and sales of 100G products to Facebook for an undisclosed time; and (iii) launched and completed an "investigation."  . . .  Defendants were forced to dramatically revise down the Company's 3Q18 Guidance by *approximately $30 million, or more than 33%*.

The market would later learn that the undisclosed chip problem had caused a shortfall of *at least $35 million* in third quarter revenue from the expected

---

[9]*Id.* at 8 ¶¶ 13-15.

"minimum $125 million" in revenue for 2018 from the Supply Agreement.[10]

The ACAC alleges that the claims for violation of the federal securities laws asserted arise from

> Defendants' deliberate decision to conceal from investors that a serious product defects had both: (i) caused AOI to suspend *all* product shipments and receipt of related revenue under the Company's most important and highly touted supply contract with Facebook, Inc. . . ; and (ii) rendered Defendants' putatively "conservative" third quarter 2018 financial guidance (the "3Q18 Guidance") — issued a short time earlier on August 7, 2018 — unattainable and misleading.[11]

## II. **<u>Defendants' Motion to Dismiss</u>**

Defendants argue that plaintiffs' ACAC should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted because the ACAC "fails to plead an actionable misstatement or omission, scienter, or loss causation."[12] Defendants also argue that plaintiffs' secondary liability claim for violation of Section 20(a) fails, and that plaintiffs should not be permitted an opportunity to amend.[13]

---

[10]<u>Id.</u> at 9 ¶¶ 16-18.

[11]<u>Id.</u> at 4-5 ¶ 1.

[12]Defendants' Motion to Dismiss, Docket Entry No. 40, p. 14.

[13]<u>Id.</u> at 30-31.

## A.    Standards of Review

### 1.    Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom. Cloud v. United States, 122 S. Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. Id. To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Twombly, 127 S. Ct. at 1966).

When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments. Dorsey v.

*Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). Courts may also rely on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* In securities cases courts may take judicial notice of the contents of public disclosure documents that are required by law to be filed with the Securities Exchange Commission ("SEC") and are actually filed with the SEC with the caveat that these documents may be considered only for the purpose of determining what statements they contain; not for proving the truth of their contents. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996)(citing and adopting rule of *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).


     2.   <u>Federal Securities Law</u>

Section 10(b) of the Securities Exchange Act makes it unlawful

> [t]o use or employ, in connection with the purchase or
> sale of any security . . . any manipulative or deceptive
> device or contrivance in contravention of such rules and
> regulations as the [SEC] may prescribe as necessary or
> appropriate in the public interest or for the protection
> of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to
> omit to state a material fact necessary in order to make
> the statements made, in the light of the circumstances
> under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.   To recover damages for violations of § 10(b) and Rule 10b-5, plaintiffs must prove

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (quoting Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1192 (2013), and Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317-18 (2011)).   Such claims are subject to pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").   Lormand v. US Unwired, Inc., 565 F.3d 228, 239 (5th Cir. 2009).


(a)   Federal Rule of Civil Procedure 9(b)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   Fed.R.Civ.P. 9(b). Plaintiffs must also plead the elements of their Rule 10b-5 claims with particularity.   See Goldstein v. MCI WorldCom, 340 F.3d 238, 245 (5th Cir. 2003)(citing Williams v. WMX Technologies, Inc., 112 F.3d 175, 177 (5th Cir.), cert. denied, 118 S. Ct. 412 (1997)). Particularity is required so that the complaint provides defendants

with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims and then attempting to discover unknown wrongs. See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994).

Pleading fraud with particularity in this circuit requires "the particulars of 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" Id. at 1068 (quoting Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1139 (5th Cir. 1992)). See also Carroll v. Fort James Corp., 470 F.3d 1171, 1174 (5th Cir. 2006) (quoting United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 381 (5th Cir. 2004) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.")). "A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim." Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004) (citing Shushany v. Allwaste, Inc., 992 F.2d 517, 520-520 (5th Cir. 1993)).

(b)   Private Securities Litigation Reform Act

In 1995 Congress amended the Securities Exchange Act of 1934 through the passage of the PSLRA, 15 U.S.C. § 78u-4(b)(1), which, in relevant part, provides:

(1)   Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2)   Required state of mind

(A) In general

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

. . .

(3)   Motion to dismiss; stay or discovery

(A) Dismissal for failure to meet pleading requirements

11

> In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

In ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002), the Fifth Circuit combined the Rule 9(b) and PSLRA pleading requirements into one succinct directive:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> (1) specify [that] each statement alleged to have been misleading, i.e., contended to be fraudulent;
>
> (2) identify the speaker;
>
> (3) state when and where the statement was made;
>
> (4) plead with particularity the contents of the false representations;
>
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
>
> (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.
>
> This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA.  Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:
>
> (7)  state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief.

In Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 532-33 (5th Cir. 2008), the Fifth Circuit held that the PSLRA heightened the pleading standards for

private claims of securities fraud by requiring plaintiffs to plead with particularity those facts giving rise to a "strong inference" that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2). Id. In Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510 (2007), the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."

In Lormand, 565 F.3d at 267, however, the Fifth Circuit held that the PSLRA did not heighten pleading standards for all six elements of securities fraud. The Fifth Circuit explained that the plain text of 15 U.S.C. § 78u-4(b)(4) provides only that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." Id. at 257 n.18. Nothing in this language expressly or impliedly heightens the standard of pleading to loss causation.

The PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove false. To qualify for this protection, the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C.

13

§ 78u-5(c)(1)(A)(i, ii).  "To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made with actual knowledge of its falsity."  <u>Southland</u>, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B).  <u>See also Nathenson v. Zonagen, Inc.</u>, 267 F.3d 400, 409 (5th Cir. 2001) (same).

## B.   Analysis

Defendants argue that the securities claims should be dismissed because plaintiffs have failed to satisfy the pleading requirements for stating either a primary claim under § 10(b) or Rule 10b-5, or a claim for control person liability under § 20(a). Defendants argue that plaintiffs have failed (1) to allege facts capable of establishing that they made any actionable misrepresentation; (2) to allege facts capable of raising a strong inference of defendants' scienter; or (3) to plead loss causation.[14] Defendants argue that plaintiffs' control-person claims under § 20(a) asserted against the individual defendants, Lin and Murry, fail because plaintiffs have failed to state a primary securities violation under §10(b) or Rule 10b-5, and that plaintiffs should not be afforded another opportunity to amend their complaint.[15]

---

[14]<u>Id.</u> at 7-9, and 14.  <u>See also</u> Defendants' Reply, Docket Entry No. 50, pp. 7-8.

[15]Defendants' Motion to Dismiss, Docket Entry No. 40, p. 30. <u>See also</u> Defendants' Reply, Docket Entry No. 50, p. 27.

1.   <u>Claims for Violation of § 10(b) and Rule 10b-5</u>

   (a)   Plaintiffs   Fail   to   Plead   an   Actionable
         Misrepresentation

Defendants argue that plaintiffs' ACAC is subject to dismissal

because they have failed to plead an actionable misrepresentation.

Asserting that

> Plaintiffs allege only that AOI's earnings guidance for
> Q3 2018 and statements that Defendants expected sales of
> 100G units to double ***became*** materially misleading when
> Defendants later suspended shipments to Facebook, because
> Defendants had a purported "duty to update" as soon as
> the shipments stopped,[16]

defendants argue that these statements

> cannot provide the basis for Plaintiffs' fraud claim for
> three independent reasons: (1) on their face, the
> statements were incapable of becoming misleading because
> they were limited to the time they were made and the
> Company told investors it would not update the
> statements; (2) even if the statements were capable of
> becoming misleading, there was no duty to update them;
> and (3) even if there was a duty to update, the Company
> did timely update the statements.[17]

Plaintiffs respond that they have adequately plead material

statements that became misleading, that defendants had a duty to

update their August 7th statements that they violated, and that the

August 7th statements are not protected by PSLRA's Safe Harbor.[18]

---

[16]Defendants' Motion to Dismiss, Docket Entry No. 40, p. 14
(citing ACAC, Docket Entry No. 34, pp. 26-27 ¶¶ 85-88).

[17]<u>Id.</u> at 14-15.

[18]Plaintiffs' Memorandum in Opposition, Docket Entry No. 49,
pp. 15-24.

"[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws." Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993). "In determining whether a predictive statement 'suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis,' a court must examine the context in which the statement [wa]s made." In re Browning-Ferris Industries Inc. Securities Litigation, 876 F.Supp. 870, 878 (S.D. Tex. 1994).  In pertinent part plaintiffs allege:

80. On August 7, 2018, AOI issued a press release, filed with the SEC on Form 8-K, announcing the Company's 2Q18 financial results, which was signed by Defendant Murry.

81. In that press release, Defendants issued the following financial guidance for 3Q18: (i) "[r]evenue in the range of $82 million to $92 million"; (ii) "[n]on-GAAP gross margin in the range of 40.0% to 41.5%"; (iii) "[n]on-GAAP net income in the range of $11.1 million to $15.2 million"; and (iv) "[n]on-GAAP fully diluted earnings per share in the range of $0.54 to $0.75 using approximately 20.4 million shares."

82. Defendant Murry restated the Company's 3Q18 Guidance set forth in ¶ 81 during the Company's earnings conference call to discuss the Company's 2Q18 results and 3Q18 Guidance, held after the market closed on August 7, 2018.

83. During the same call, Defendant Murry made the following statement concerning AOI's 100G volumes in the second half of 2018:

> [W]e continue to expect 100G volumes to more than double in the second half of this year over the first half, which is based largely on the committed orders we announced in Q1 of this year.

16

84. During the call, Defendant Lin made a substantially similar statement:

> We are pleased with our results and continue started executions in the quarter as the demand environment improved. Looking ahead, we remain encouraged by the trend we see in the market, we can nearly expect 100G volume with more than double in the second half of this year over the first half, which is based largely on a committee [sic] order we announced in Q1 of this year.

85. The statements set forth in ¶¶ 81-84 were definite, positive projections. They contained factual representations that remained alive in the minds of investors concerning AOI's then-existing financial prospects, as reflected in the analysts' reactions alleged above, including at ¶¶ 65-66, 74. By electing to speak publicly about AOI's 3Q18 Guidance and the 100G volumes supporting that Guidance — thereby putting these subjects into play — Defendants had a duty to fully, completely, and truthfully disclose all material facts bearing upon these issues when Defendants made the deliberate decision to suspend shipments to Facebook due to product quality issues, which immediately imperiled AOI's revenue and 100G shipment volumes, rending their statements materially misleading.

86. As soon as AOI ceased shipping product to Facebook under the Supply Agreement, Defendants possessed more than adequate information to provide a timely update to investors that their August 7, 2018 statements were no longer reliable. Namely, when Defendants suspended AOI's shipments under the Supply Agreement, they knew that AOI would not earn the revenue necessary to meet the 3Q18 Guidance.

87. Rather than informing investors that the 3Q18 Guidance [] was no longer be reliable, Defendants sat idly by until securities analysts provided such information to investors on September 27, 2018. By that time, Defendants had already: (i) identified the defect with the Company's 25G laser chip; (ii) suspended all shipments to Facebook of the transceivers utilizing the 25G laser chips;

(iii) authorized an investigation into the defect;
(iv) addressed the defect with Facebook;
(v) completed the investigation; and (vi) resumed
shipments to Facebook.  During the delay period,
which likely would have dragged on but for the
analysts' reporting on AOI's chip defect, investors
continued to rely upon the materially misleading
3Q18 Guidance, which deprived investors of the
ability to make informed investment decisions.

88.   By failing until September 28, 2018 — the last day
of the third quarter — to update the statements set
forth in ¶¶ 81-84, despite Defendants' actual
knowledge or reckless disregard of the material
facts arising from these subsequent, intervening
events, Defendants violated a duty to update their
statements.[19]

In pertinent part the August 7, 2018, Press Release filed with

the SEC on Form 8-K, announcing the Company's 2Q18 financial

results, stated:

**Third Quarter 2018 Business Outlook**[+]

For the third quarter of 2018, the company currently
expects:

- Revenue in the range of $82 million to $92 million.

- Non-GAAP gross margin in the range of 40.0% to
  41.5%.

- Non-GAAP net income in the range of $11.1 million
  to $15.2 million, and non-GAAP fully diluted
  earnings per share in the range of $0.54 to $0.75
  using approximately 20.4 million shares.

[+] Please refer to the note below on forward-looking
statements and the risks involved with such statements as
well as the note on non-GAAP financial measures.

. . .

---

[19]ACAC, Docket Entry No. 34, pp. 25-27 ¶¶ 80-88.

Forward-Looking Information

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements reflect the views of management at the time such statements are made. These forward-looking statements involve risks and uncertainties, as well as assumptions and current expectations, which could cause the company's actual results to differ materially from those anticipated in such forward-looking statements. These risks and uncertainties include but are not limited to: the company's reliance on a small number of customers for a substantial portion of its revenues; reduction in the size or quantity of customer orders; change in demand for the company's products or their rate of deployment of their products; changes in manufacturing operations; volatility in manufacturing costs; delays in shipments of products; disruptions in the supply chain; change in the rate of design wins or the rate of customer acceptance of new products; . . . You should not rely on forward-looking statements as predictions of future events. All forward-looking statements in this press release are based upon information available to us as of the date hereof, and qualified in their entirety by this cautionary statement. Except as required by law, we assume no obligation to update forward-looking statements for any reason after the date of this press release to conform these statements to actual results or to changes in the company's expectations.[20]

> **(1)** **Plaintiffs Have Failed to Allege Facts Capable of Establishing that Defendants' August 7th Statements Became Misleading or that Defendants Had a Duty to Update Them**

Citing Greenthal v. Joyce, No. 4:16-cv-41, 2016 WL 362312, *3 (S.D. Tex. January 29, 2016), and Winick v. Pacific Gateway Exchange, Inc., 73 F. App'x 250, 254 (9th Cir. 2003), withdrawn pursuant to settlement, 80 F. App'x 1 (9th Cir.), defendants argue

---

[20]August 7, 2018, Form 8-K, Exhibit 3 to Defendant's Motion to Dismiss, Docket Entry No. 41-3, pp. 5-6.

that the August 7th statements were "incapable of becoming misleading because they were expressly limited to the time they were made, and the Company told investors it would not update the statements."[21] <u>Greenthal</u> involved a class action complaint for alleged violations of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 in which the plaintiff sought expedited discovery and a temporary restraining order ("TRO") enjoining a vote on a merger "until Defendants disclosed certain material information concerning the Proposed Transaction that ha[d] been omitted from the definitive proxy." 2016 WL 362312, * 1. The plaintiff's request for a TRO required the court to analyze the likelihood of plaintiff's success on the merits. In pertinent part plaintiff alleged that defendants had a duty to disclose updated information, and defendants disputed that they had a duty to update their disclosures. <u>Id.</u> at *3. Observing that plaintiff had included a lengthy footnote citing case law from various jurisdictions for the duty to update, but failed to cite any Fifth Circuit cases finding a duty to update in the § 14(a) context, the court found that even if the defendants were subject to a duty to update, the information provided in the proxy statement was not misleading because "Defendants repeatedly explained that the projections and analyses 'speak only as of the date made' . . . and 'will not be updated.'" <u>Id.</u> The court explained that

---

[21]Defendants' Motion to Dismiss, Docket Entry No. 40, p. 15.

> Defendants are correct that "[t]he authorities cited by
> Plaintiff found a 'duty to update' only where a defendant
> is representing that its statements continue to remain
> current, not where (as here) Defendants disclosed
> historical information and repeatedly disclaimed any
> inference that this information would remain current
> after the date it was created or would be updated."

Id. (citing In re Time Warner Inc. Securities Litigation, 9 F.3d

259, 267 (2d Cir. 1993) ("But, in this case, the attributed public

statements lack the sort of definite positive projections that

might require later correction."); In re International Business

Machines Corp. Securities Litigation, 163 F.3d 102, 110 (2d Cir.

1998) ("There is also no need to update when the original statement

was not forward looking and does not contain some factual

representation that remains 'alive' in the minds of investors as a

continuing representation."); In re Bristol-Meyers Squibb

Securities Litigation, No. Civ. A. 00-1990(SRC), 2005 WL 2007004,

at *23 (D.N.J. August 17, 2005) ("Most federal circuits have held

that there is a duty to update when forward-looking statements

still 'alive' in the market have become inaccurate.").

Winick involved a class action complaint for alleged

violations of §§ 10(b) and 20(a) of the Securities Exchange Act of

1934 concerning allegedly material misrepresentations about the

defendant's liquidity. The plaintiffs alleged that when financing

efforts failed, the defendants had a duty to update their prior

statements of optimism regarding the company's ability to meet its

future obligations. Observing that plaintiffs relied on

> In re Burlington Coat Factory, 114 F.3d 1410 (3d Cir.
> 1997), for the proposition that a duty to update attaches
> to forward-looking statements containing an implicit
> factual representation that remained "alive" in the minds
> of investors as a continuing representation,

Winick, 73 F. App'x at 254, the Ninth Circuit held that the

defendants had no duty to update because "[t]he company repeatedly

disclaimed any obligation to update its forecasts; thus, the

company's predictions regarding its ability to meet its future

obligations could not have remained 'alive' in the minds of

reasonable investors."   Id.

Plaintiffs argue that "[b]y issuing concrete projections based

on 'committed orders' under the Supply Agreement, pertaining to

specific time frames, Defendants had a legal duty to update their

August 7 Statements when the shipment suspension rendered them

materially misleading."[22]   Asserting that "[i]f a corporation

voluntarily makes a public statement that is correct when issued,

it has a duty to update that statement if it becomes materially

misleading in light of subsequent events,"[23] and citing In re

Browning-Ferris Industries Inc. Securities Litigation, 876 F.Supp.

870, 882-83 (S.D. Tex. 1994), plaintiffs argue that "[f]or a duty

to update to attach, the initial statements must be forward-

looking, 'become misleading as to a material matter,' and 'remain

---

[22]Plaintiff's Memorandum in Opposition, Docket Entry No. 49,
p. 15.

[23]Id.

alive' in investors' minds."[24]  Plaintiffs argue that "Defendants'
August 7 Statements satisfy each of these requirements."[25]
Defendants do not dispute that the August 7th statements about
3Q2018 earnings guidance and sales predictions were forward-
looking.[26]

Plaintiffs neither allege nor argue that the August 7, 2018,
earnings guidance or sales predictions were false or misleading
when made.  Instead, plaintiffs allege that the earnings guidance
and sales predictions became misleading when AOI stopped shipping
product to Facebook for an unidentified, temporary period of time
during the 3Q18 and defendants failed to update their August 7,
2018, statements.  But missing from the ACAC are any allegations of
fact capable of establishing that the sales predictions for the
second half of 2018 or the earnings guidance for third quarter of
2018 ever became materially misleading or remained "alive" in
investors' minds when AOI temporarily stopped delivering product to
Facebook.

The sales predictions that defendants allege became misleading
when AOI temporarily stopped shipping product to Facebook in the
third quarter of 2018, are Murry's statement during the August 7,

---

[24]Id.

[25]Id.

[26]See Defendants' Motion to Dismiss, Docket Entry No. 40, p. 15
(referring to the statements as forward-looking).

2018, earnings that "we continue to expect 100G volumes to more than double in the second half of this year over the first half, which is based on the committed orders we announced in Q1 of this year,"[27] and Lin's statement during that call that "we remain encouraged by the trend we see in the market, we can nearly expect 100G volume with more than double in the second half of this year over the first half, which is based largely on a committee [sic] order we announced in Q1 of this year."[28]   But while plaintiffs allege that the volume of 100G sales dipped during the third quarter because AOI temporarily stopped delivering products to Facebook, plaintiffs' allegations are limited to the third quarter. Accordingly, plaintiffs have failed to allege any facts capable of establishing that the defendants August 7, 2018, statements regarding their expectations for 100G volumes ever became misleading.   Nor do plaintiffs allege any facts capable of establishing that defendants August 7, 2018, sales-related statements remained "alive" in the minds of investors when AOI temporarily stopped delivering product to Facebook in the third quarter of 2018.

The forward-looking statements that defendants made about AOI's 3Q18 earnings guidance in both the August 7, 2018, press release and during an August 7, 2018, earnings call were expressly

---

[27]ACAC, Docket Entry No. 34, p. 26 ¶ 83.

[28]Id. ¶ 84.

qualified by statements in the press release that they reflect what "the company currently expects" and "the views of management at the time such statements are made."[29]   These qualifying statements prevented any reasonable investor from viewing the 3Q18 earnings guidance as a "guaranty" or "assurance" that the specific earnings predicted would, in fact, be achieved, and prevented defendants' August 7, 2018, earnings guidance for 3Q18 from becoming misleading as to a material matter when AOI temporarily stopped shipping product to Facebook in 3Q18.   See Krim, 989 F.2d at 1446 ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.").

Since, moreover, the press release asserted, "we assume no obligation to update forward-looking statements for any reason after the date of this press release to conform these statements to actual results or to changes in the company's expectations,"[30] the 3Q18 earnings guidance could not have remained "alive" in the minds of reasonable investors beyond the day it was made.   See Winick, 73 F. App'x at 254.   This conclusion is corroborated by the fact that plaintiffs' only allegations of market reaction to the August 7, 2018, earnings guidance are that "[t]he market reacted favorably"

---

[29]August 7, 2018, Form 8-K, Exhibit 3 to Defendant's Motion to Dismiss, Docket Entry No. 41-3, pp. 5-6.

[30]Defendants' Motion to Dismiss, Docket Entry No. 40, p. 15. See also Defendants' Reply, Docket Entry No. 50, p. 11.

as reflected by "a report with a 'Buy' rating for AOI,"[31] and "a same-day report . . . in which [a commentator] increased its 12-month per share price target from $42 to $53."[32]

Because plaintiffs have failed to allege facts capable of establishing either that defendants' August 7, 2018, forward-looking statements about AOI's expected 100G sales and 3Q18 earnings guidance became misleading as to a material matter when AOI temporarily stopped shipping product to Facebook in 3Q2018, or remained alive in investors' minds at anytime beyond the day the statements were made, plaintiffs have failed to allege facts capable of establishing that defendants had a duty to update the August 7, 2018, earnings guidance. See In re Burlington, 114 F.3d at 1433 ("[W]e do not think it can be said that an ordinary earnings projection contains an implicit representation on the part of the company that it will update the investing public with all material information that relates to that forecast.").

> **(2)  Plaintiffs Have Failed to Allege Facts Capable of Establishing that the August 7th Statements Are Not Entitled to the PSLRA's Safe Harbor**

Plaintiffs argue that defendants' contention that their August 7, 2018, statements were incapable of becoming misleading because they were limited to the time they were made, effectively claims

---

[31]ACAC, Docket Entry No. 34, p. 20, ¶ 65.

[32]Id. at 21 ¶ 66.

protection by the PSLRA's "Safe Harbor," but that these statements do not fall within the PSLRA's Safe Harbor because they were not accompanied by sufficiently substantive cautionary language.[33]

> The safe harbor provision protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. . . . Where the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" as to its falsity.

In re BP P.L.C. Securities Litigation, 852 F. Supp. 2d 767, 789 (S.D. Tex. 2012) (quoting 15 U.S.C. § 78u-5(c)(l)(A)(i)-(ii) and 78u-5(c)(1)(B)). A forward-looking statement is a statement that contains financial projections (i.e., projection of revenues, income, or earnings per share), statements of plans and objectives of management for future operations, and statements of future economic performance. See id. at 798-99 (citing 15 U.S.C. § 78u-5(i)(1)).

The defendants' August 7, 2018, statements are financial projections for 3Q18 and projections of sales for the second half of 2018, i.e., statements of future economic performance. The parties do not dispute that the defendants' August 7, 2018, statements are forward-looking or that they were accompanied by

_____

[33]Plaintiffs' Memorandum in Opposition, Docket Entry No. 49, p. 22.

cautionary language.  In dispute is whether the cautionary language
is sufficient to afford the statements Safe Harbor protection.
Asserting that "AOI's 'cautionary language' was boilerplate,"[34]
plaintiffs argue that

> ]n]owhere does AOI's putative cautionary language
> specifically address the Supply Agreement, the risk that
> Defendants would voluntarily suspend all shipments under
> the Supply Agreement, or the risks to AOI's performance
> or projections from the Company's own decision to stop
> shipping products in light of adverse developments
> related to that Agreement.[35]

Quoting <u>City of Austin Police Retirement System v. Kinross Gold
Corp.</u>, 957 F.Supp.2d 277, 301 (S.D.N.Y. 2013), plaintiffs argue:

> [G]eneric and mere boilerplate words of caution — ***for
> example, a statement at the beginning of a conference
> call that states merely that "forward-looking statements
> are subject to certain risks and uncertainties"*** — are
> insufficient to put investors on notice of the risks at
> hand and therefore to inoculate these statements.[36]

Defendants counter that "AOI warned of specific risks and
uncertainties that could cause results to materially differ."[37]  The
August 7, 2018, Press Release included in AOI's Form 8-K filed with
the SEC expressly warned that AOI's "reliance on a small number of
customers for a substantial portion of its revenues," "change in
demand for the company's products," "delays in shipments of

---

[34]<u>Id.</u> at 23.

[35]<u>Id.</u>

[36]<u>Id.</u>

[37]Defendants' Reply, Docket Entry No. 50, p. 16.

products," and "potential pricing pressure," "could cause the company's actual results to differ materially from those anticipated in such forward-looking statements."[38] Because the cautionary language in that accompanied the defendants' August 7, 2018, forward-looking statements was not boilerplate but, instead, was language that qualified those statements by identifying the precise risks that AOI later experienced, the court concludes that the cautionary statements in the Press Release were sufficiently substantive to afford the defendants' statements Safe Harbor protection.

Even if the defendants' August 7, 2018, forward-looking statements had not been accompanied by cautionary statements sufficiently substantive to afford them Safe Harbor protection, the court concludes that the statements are not actionably misleading or capable of becoming actionably misleading. Since passage of the PSLRA, the Fifth Circuit has consistently held that predictive statements are only actionable if they are "false when made." In re Plains All American Pipeline, L.P. Securities Litigation, 245 F.Supp.3d 870, 919 n. 11 (S.D. Tex. 2017), aff'd on other grounds sub nom. Police and Fire Retirement System of City of Detroit v. Plains All American Pipeline, LP, 777 F. App'x 726 (5th Cir. 2019). See also In re BP P.L.C. Securities Litigation, 852 F. Supp. 2d at

---

[38]August 7, 2018, Form 8-K, Exhibit 3 to Defendant's Motion to Dismiss, Docket Entry No. 41-3, pp. 5-6.

29

790 (S.D. Tex. 2012) ("Statements that are predictive in nature are actionable only if they were false when made.") (citing Shushany v. Allwaste, Inc., 992 F.2d 517, 524 (5th Cir. 1993)).   Because plaintiffs do not allege that defendants' August 7, 2018, forward-looking statements were false when made or were made without a genuine belief in their accuracy, without a reasonable basis, or with awareness of undisclosed facts that would tend to seriously undermine the accuracy of the statements, those statements are not adequately plead as fraudulent and therefore are not actionable under the Securities Exchange Act.   See In re Anadarko Petroleum Corp. Class Action Litigation, 957 F. Supp.2d 806, 831 (S.D. Tex. 2013) ("It is very clear that a prediction is not adequately pled as fraudulent simply because the prediction later turned out to be incorrect.").

> **(3)   Assuming that Defendants Had a Duty to Update; Defendants Timely Updated Their Statements**

Alternatively,  assuming  that  defendants'  decision  to temporarily stop shipping products to Facebook in the third quarter of 2018 rendered their August 7, 2018, statements materially misleading and triggered a duty for defendants to update those statements, the court concludes that defendants timely updated their statements on September 28, 2018.  The ACAC alleges that on September 28, 2018, AOI disclosed the issues that prompted defendants to temporarily stop shipping product to Facebook and

updated their revenue guidance.  Defendants argue that plaintiffs'
allegations are not actionable because plaintiffs do not allege
that "the Company failed to update its August 7, 2018[,] guidance
at all, but that it failed to do so *soon enough.*"[39]

Asserting that defendants were aware of the suspension of
shipments to Facebook the moment it was authorized, and that the
suspension had a direct, immediate, and negative impact on AOI's
3Q18 revenues because AOI booked revenues as soon as product
shipped, plaintiffs argue their claim is not that defendants'
revised guidance came too late but, instead, that defendants
violated their duty to inform investors that their August 7, 2018,
3Q18 earnings guidance and other statements became unreliable the
moment the suspension of shipments was authorized.[40]  Plaintiffs
allege that defendants violated the securities laws by failing to
disclose relevant facts and update earnings guidance before
September 28, 2018,[41] but fail to cite any authority in support of
their contention that defendants were obligated to disclose the
suspension of shipments to Facebook as soon as it was authorized or
any sooner than the defendants did disclose it.  The SEC's
affirmative disclosure requirements consist of "specific periodic

---

[39]Defendant's Motion to Dismiss, Docket Entry No. 40, p. 20.

[40]Plaintiff's Memorandum in Opposition, Docket Entry No. 49,
pp. 21-22.

[41]ACAC, Docket Entry No. 34, 22-23 ¶¶ 72-73.

reporting requirements (primarily the requirements to file quarterly and annual reports)." In re Burlington, 114 F.3d at 1432.

Moreover, even if the suspension of deliveries to Facebook triggered a duty to update their August 7, 2018, statements, defendants were entitled to conduct a reasonable investigation before making an update. See Higginbotham v. Baxter International, Inc., 495 F.3d 753, 760-61 (7th Cir. 2007) (holding that defendants are "entitled to investigate for a reasonable time, until they have a full story to reveal," and that "[p]rudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention"). Defendants' investigation here lasted, at most, just over seven weeks, which is far less than the four- and six-month investigations deemed reasonable in other cases. See In re Goodyear Tire & Rubber Co. Securities Litigation, No. 88-8633, 1993 WL 130381, *12-13 (E.D. Pa.), aff'd, 16 F.3d 403 (3d Cir. 1993) (holding that a press release updating earnings forecasts that were announced two to six months earlier was not a belated disclosure because even though the company had internal estimates that were lower than their initial forecasts, plaintiffs had not shown that the company's internal estimates were so certain that they revealed the earlier forecasts were materially misleading); In re Pretium Resources Inc. Securities Litigation, 256 F.Supp.3d 459, 479-80 (S.D.N.Y. 2017) (holding that a company's

four-month investigation was reasonable before it disclosed a consultant's opinion that earlier estimates of gold reserves were misleading), aff'd sub nom. Martin v. Quartermann, 732 F. App'x 37 (2d Cir. 2018). Because plaintiffs have not alleged any facts capable of establishing that seven-weeks was an unreasonable period of time for the defendants to investigate the quality issue that caused the suspension of shipments to Facebook, and because in Higginbotham, 495 F.3d at 761, the court recognized that making announcements before conducting a reasonable investigation might plausibly lead to "accus[ations] of deceiving investors," the court concludes that even if defendants had a duty to update their August 7, 2018, statements, plaintiffs have failed to state a claim for which relief may be granted because they have failed to allege facts capable of establishing that defendants failed to timely update their August 7, 2018, statements.

(b)   Plaintiffs Fail to Plead Scienter

Defendants argue that they are entitled to dismissal of the § 10(b) and Rule 10b-5 claims asserted against them because plaintiffs have failed to raise a strong inference of scienter.[42] "Scienter" is a state of mind embracing "an intent to deceive, manipulate, or defraud or severe recklessness." Lormand, 565 F.3d

---

[42]Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 23-28.

at 251 (quoting <u>Indiana Electric,</u> 537 F.3d at 533). "Severe recklessness" is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

<u>Indiana Electric,</u> 537 F.3d at 533 (citations omitted). Under the PSLRA, 15 U.S.C. § 78u-4(b)(2), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Lormand,</u> 565 F.3d at 251. In <u>Tellabs,</u> 127 S. Ct. at 2510, the Supreme Court held that a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." The critical issue in a motion to dismiss based on insufficient allegations of scienter "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Id.</u> at 2509 (citing <u>Abrams v. Baker Hughes Inc.,</u> 292 F.3d 424, 431 (5th Cir. 2002)).

34

Defendants argue that plaintiffs' allegations are insufficient to demonstrate that any failure to update the forward-looking statements made on August 7, 2018, was done with scienter.[43]   For the reasons stated in § II.B.1(a), above, the court has already concluded that plaintiffs have failed either to allege any facts or to cite any authority capable of establishing that defendants had a duty to update the sales predictions or earnings guidance they made on August 7, 2018.   Plaintiffs' failure to allege facts capable of establishing that defendants had a duty to update their August 7, 2018, statements precludes plaintiffs from raising a strong inference of scienter with respect to their alleged failure to update those statements when AOI suspended delivery of product to Facebook.   See Chiarella v. United States, 100 S. Ct. 1108, 1118 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

Plaintiffs argue that they have adequately plead scienter because they have alleged that the defendants had actual knowledge of the concealed facts, that the alleged fraud concerns matters and information that defendants had access to and a duty to monitor, and that Linn and Murry have high-ranking positions and extensive control over AOI's operations such that the "special circumstances" exception set forth in Nathenson, 267 F.3d at 425, apply to this

---

[43]Id. at 23-25.   See also Defendants' Reply, Docket Entry No. 50, pp. 21-25.

case.[44]    Scienter in a particular case may not be based on
allegations that the defendants knew the concealed information by
virtue of their positions or "close involvement in the day-to-day
operation and management of [the company]." Goldstein v. MCI
WorldCom, 340 F.3d 238, 251 (5th Cir. 2003). Nor is the "special
circumstances" exception recognized in Nathenson applicable to the
facts of this case.

     In Nathenson the Fifth Circuit held that the individual
defendants' positions within the defendant pharmaceutical company
enhanced the scienter allegations. Recognizing "that normally an
officer's position with a company does not suffice to create an
inference of scienter," Nathenson, 267 F.3d at 424, the court found
a number of special circumstances that taken together, sufficed to
support a different result in that case:  (1) the company was small
and had only three-dozen full-time employees; (2) it was
essentially a one-product company; and (3) the alleged
misrepresentations were about the patent protection for that single
product, the company's most crucial issue.  Id. at 425.

     The Fifth Circuit and other courts have been reluctant,
however, to apply the limited exception recognized in Nathenson.
See Abrams, 292 F.3d at 432 ("A pleading of scienter may not rest on
the inference that defendants must have been aware of the

_____

     [44]Plaintiffs' Memorandum in Opposition, Docket Entry No. 49,
p. 25.

misstatement based on their positions within the company."). Instead, the Fifth Circuit has stated that only in the "rare case" will a strong inference of scienter be drawn from an officer's position in a company, and only when this factor combines with other, "special circumstances." Local 731 I.B of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc., 810 F.3d 951, 958-59 (5th Cir. 2016). The Fifth Circuit reiterated that such circumstances may include: (1) a small company in which corporate executives are more likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. Id. at 959.

Plaintiffs neither allege nor argue that facts capable of establishing any of the special circumstances recognized in Nathenson or Diodes are present in this case. Plaintiffs' allegations that AOI's "products include advanced optical devices, packaged optical components, optical subsystems, laser transmitters, and fiber-optic transceivers,"[45] that

> AOI has three major locations: (i) Sugar Land, Texas where it manufactures laser chips, subassemblies, and components; (ii) Ningbo, China, where it manufactures labor-intensive components and optical equipment systems;

---

[45]ACAC, Docket Entry No. 34, p. 11 ¶ 28.

and (iii) New Taipei City, Taiwan, where it manufactures optical components and subassemblies,[46]

and that "[d]uring the Class Period, AOI served four primary end-markets: (i) internet data centers, . . .; (ii) cable television, . . .; (iii) fiber-to-home, . . .; and (iv) telecommunications,"[47] demonstrates that AOI differs substantially from the small, single product companies at issue in Nathenson and Diodes. Instead, as special circumstances capable of allowing a strong inference of scienter to be drawn from Linn's and Murry's position with AOI, plaintiffs argue only that

> (i) the Supply Agreement was critical to the company's vitality (factor 2), as it governed AOI's relationship with one of its three major customers in its lucrative DC segment and 100G market (¶¶ 33, 109); and (ii) information rendering Defendants' statements materially misleading "would have been readily apparent" (factor 3), as their statements were inconsistent with the facts on the ground (factor 4)—Defendants admitted as much on September 28. ¶¶ 68, 79, 86-87.[48]

Since, however, for the reasons stated in § II.B.1(a)(1), above, the court has already concluded that Plaintiffs have failed to plead facts capable of establishing that defendants had a duty to update their August 7, 2018, statements about AOI's sales predictions and earnings guidance, Plaintiffs' attempt to infer a strong inference of scienter for and/or from failing to making

---

[46]Id. at 12 ¶ 31.

[47]Id. ¶ 32.

[48]Plaintiff's Memorandum in Opposition, Docket Entry No. 49, p. 26.

those updates fails.   Absent a duty to disclose, failure to disclose is incapable of raising a strong inference of scienter. See Chiarella, 100 S. Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

        (c)   Plaintiffs Fail to Plead Loss Causation

Defendants argue that they are entitled to dismissal of the § 10(b) and Rule 10b-5 claims asserted against them because plaintiffs have failed to allege facts capable of establishing loss causation.[49]   In Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005), the Supreme Court held that the PSLRA requires plaintiffs to plead loss causation, "i.e., a causal connection between the material misrepresentation and the loss."   See 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").   See also Amgen, 133 S. Ct. at 1192, (confirming that loss causation continues to be an element of a private securities fraud action under § 10(b)).

> For a complaint to adequately plead this requirement, it
> need only set forth "a short and plain statement of the
> claim showing that the pleader is entitled to relief" and
> provide the defendant with "fair notice of what the

---

[49]Defendants' Motion to Dismiss, Docket Entry No. 40, pp. 28-30.   See also Defendants' Reply, Docket Entry No. 50, pp. 25-27.

plaintiff's claim is and the grounds upon which it rests."

Public Employees Retirement System of Mississippi, Puerto Rico Teachers Retirement System v. Amedisys, Inc., 769 F.3d 313, 320 (5th Cir. 2014), cert. denied, 135 S. Ct. 2892 (2015) (quoting Dura Pharmaceuticals, 125 S. Ct. at 1627, 1633-34; and Conley v. Gibson, 78 S. Ct. 99, 103 (1957)). Nevertheless, plaintiffs pleading loss causation "are required to allege the truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatments." Id. at 321 (quoting Lormand, 565 F.3d at 255-56). See also Spitzberg v. Houston American Energy Corp., 758 F.3d 676, 688 (5th Cir. 2014) ("The applicable standard in this circuit under Lormand, 565 F.3d at 256 n. 20, is that a corrective disclosure must 'make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true).'").

Plaintiffs allege that on August 7, 2018, the defendants issued a press release and made statements about sales predictions and third quarter earnings guidance that later proved to be false. Plaintiffs allege that on September 27, 2018, analyst Loop Capital downgraded AOI stock from "Hold to Sell" and lowered its price target by more than half from $45 to $20 following the analyst's own "industry checks suggesting that 1) AAOI is having product quality issues in 100G CWDM4 transceivers, and 2) the pricing

environment for 100G data center optics remains very rough."[50]
Plaintiffs allege that in response to this information, AOI's share
price fell by over 9% from a close of $31.34 per share on September
26, 2018, to close at $28.36 per share on September 27, 2018.[51]
Plaintiffs allege that before the market opened on September 28,
2018, AOI issued a press release filed with the SEC on Form 8-K
stating that the company and a customer had mutually agreed to
temporarily suspend shipments due to product quality issues that
were investigated and resolved.[52]  Plaintiffs allege that

> [a]s a direct and proximate result of this corrective
> disclosure and/or materialization of the foreseeable
> risks concealed by Defendants' failure to timely update
> their August 7, 2018 statements, AOI's share price fell
> by $3.70 per share, more than 13%, to close at $24.66 per
> share on September 28, 2018, on unusually high volume.[53]

---

[50]ACAC, Docket Entry No. 34, p. 28 ¶ 91.

[51]Id. at 29 ¶ 93.

[52]Id. ¶ 95.

[53]Id. at 30 ¶ 97.  The Fifth Circuit has recognized that other
circuit courts have held that the element of loss causation can be
plead by alleging facts capable of establishing the materialization
of a foreseeable but concealed risk.  See, e.g., Ludlow v. BP, PLC,
800 F.3d 674, 689-90 n. 68 (5th Cir. 2015), cert. denied, 136 S.
Ct. 1824 (2016) (citing Schleicher v. Wendt, 618 F.3d 679, 683 (7th
Cir. 2010), and In re Vivendi Universal, S.A. Securities
Litigation, 634 F.Supp.2d 352, 359 (S.D.N.Y. 2009)).  See also
Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir.), cert.
denied, 126 S.Ct. 421 (2005) (indicating that a plaintiff must
allege that his loss was "foreseeable" and that it was caused by
the "materialization of the concealed risk.").  Assuming without
deciding that the Fifth Circuit would recognize materialization of
the risk as a way of pleading loss causation, plaintiffs have
failed to allege facts capable of doing so because they have failed
(continued...)

Plaintiffs have not alleged that any of the September 2018 disclosures reveal or specifically correct any prior misrepresentation or omission. Nor have Plaintiffs alleged that any truth revealed in September 2018 was "related to" or "relevant to" any statement alleged to have been false or misleading when made. Instead, plaintiffs contend that the September 2018 disclosures qualify as "corrective" merely because they updated the defendants' truthful earnings guidance and sales predictions of August 7, 2018, with news that AOI would not meet its 3Q18 earnings forecasts, and that news was followed by a drop in stock price. But "[m]ere failure to meet earnings forecasts is insufficient to establish loss causation." In re Dell Inc., Securities Litigation, 591 F.Supp.2d 877, 909 (W.D. Tex. 2008) (citing In re AOL Time Warner, Inc. Securities Litigation, 503 F.Supp.2d 666, 678-79 (S.D.N.Y. 2007)).

---

[53] (...continued)
to allege that defendants concealed a foreseeable risk that eventually materialized and caused them harm. Instead, plaintiffs allege only that defendants delayed in disclosing the temporary cessation of product shipments to Facebook. For the reasons stated in § II.B.1(a)(1) and (3), above, the court has already concluded that plaintiffs have failed to plead facts capable of establishing an actionable misrepresentation, and have failed to allege facts capable of establishing that defendants' August 7, 2018, statements became misleading, that defendants had a duty to update those statements, or that assuming defendants did have a duty to update them, defendants failed to do so in a timely fashion. And for the reasons stated in § II.B.1(a)(2), above, the court has already concluded that defendants warned of the specific risks that eventually caused AOI not to meet the expectations stated on August 7, 2018.

Plaintiffs allege that the September 2018 disclosures show that the temporary cessation of shipments to one customer and resulting reduction in earnings guidance was attributable to product quality issues.  But plaintiffs fail to allege that on August 7, 2018, defendants either made or failed to make any statements about product quality.  The September 2018 disclosures that AOI temporarily stopped shipping transceivers to one customer due to product quality issues, and that the stoppage caused a reduction in earnings guidance and sales predictions do not qualify as corrective disclosures because they did not reveal that defendants' August 7, 2018, earnings guidance and/or sales predictions were false or misleading when made, or that the existence of actionable fraud is more probable than it would be without those disclosures.  Because the September disclosures do not qualify as corrective, plaintiffs have failed to allege loss causation.  See Markman v. Whole Foods Market, Inc., No. 1:15-CV-681-LY, 2016 WL 10567194, *12 (W.D. Tex. Aug. 19, 2016) ("[Absent] a false representation, there can be no revelation of falsity to the market.").

2.   Claims for Violation of § 20(a) Control Person Liability

Plaintiffs allege that the individual defendants, Lin and Murry, are liable as "control persons" of AOI under § 20(a) of the

Exchange Act.[54]  Section 20(a) imposes joint and several liability for securities fraud on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder."  15 U.S.C. § 78t(a).  "Control person liability is secondary only and cannot exist in the absence of a primary violation."  <u>Southland,</u> 365 F.3d at 383.  Defendants' argue that the control person claims asserted in plaintiffs' ACAC are subject to dismissal because plaintiffs' primary claims under § 10(b) are subject to dismissal.  Because the court has concluded that the primary claims asserted against all of the defendants are subject to dismissal for failure to allege an actionable misrepresentation, the § 20(b) claim that plaintiffs have asserted against Lin and Murry are also subject to dismissal.  <u>Id.</u>  <u>See also Alaska Electricians Pension Fund v. Flotek Industries, Inc.,</u> 915 F.3d 975, 986 (5th Cir. 2019) ("Because Plaintiffs have not established a primary violation, their Section 20(a) claims fail.").

## III. **<u>Plaintiffs' Motion to Amend</u>**

At the end of their Memorandum in Opposition to Defendants' Motion to Dismiss, Plaintiffs assert that "[i]f the Court grants Defendants' Motion (in part or in full), Plaintiffs respectfully

---

[54]ACAC, Docket Entry No. 34, pp. 40-42 ¶¶ 134-41.

request leave to amend pursuant to Rule 15."[55.]  Federal Rule of
Civil Procedure 15(a)(2) states that "[t]he court should freely
give leave [to amend] when justice so requires."  "Although Rule
15[a] 'evinces a bias in favor of granting leave to amend,' it is
not automatic."  Matter of Southmark Corp., 88 F.3d 311, 314 (5th
Cir. 1996), cert denied, 117 S. Ct. 686 (1997) (quoting Dussouy v.
Gulf Coast Investment Corp., 660 F.2d 594, 597 (5th Cir. 1981)).
"A decision to grant leave is within the discretion of the trial
court.  Its discretion, however, is not broad enough to permit
denial if the court lacks a substantial reason to do so."  Id.
(citing State of Louisiana v. Litton Mortgage Co., 50 F.3d 1298,
1302-1303 (5th Cir. 1995) (per curiam)).  Generally, a district
court errs in dismissing a complaint for failure to state a claim
under Rule 12(b)(6) without giving the plaintiff an opportunity to
amend.  Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir.) (per
curiam), cert. denied, 119 S. Ct. 156 (1998).  If, however, a
complaint alleges the plaintiff's best case, there is no need for
further amendment.  Id.  See also Jones v. Greninger, 188 F.3d 322,
327 (5th Cir. 1999) (per curiam) (dismissing plaintiff's pro se
action because court could perceive of no viable claim plaintiff
could include in an amended complaint based on the underlying
facts).  The Fifth Circuit has also held that in exercising its

---

[55]Plaintiffs' Memorandum in Opposition, Docket Entry No. 49,
p. 25.

discretion, a court may consider various criteria including, <u>inter alia,</u> the failure to cure deficiencies by amendments previously allowed and futility of the proposed amendment. <u>See Whitaker v. City of Houston, Texas,</u> 963 F.2d 831, 836 (5th Cir. 1992) (citing <u>Foman v. Davis,</u> 83 S. Ct. 227, 230 (1962)). Because plaintiffs have already filed an amended complaint and because the court is persuaded that plaintiffs have pleaded their best case, the plaintiffs' request for leave to amend will be denied.

## IV. <u>Conclusions and Order</u>

For the reasons stated in § II, above, the court concludes that plaintiffs have failed to state claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against defendants arising from their failure to timely update sales predictions and earnings guidance made on August 7, 2018, when AOI temporarily suspended shipments of product to Facebook. Accordingly, Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint, Docket Entry No. 40, is **GRANTED** and the claims asserted against defendants will be dismissed with prejudice.

For the reasons stated in § III, above, the court concludes that plaintiffs should not be allowed an additional opportunity to amend. Accordingly, plaintiff's request to amend stated at the end

46

of their Memorandum in Opposition, Docket Entry No. 49, is **DENIED**.

**SIGNED** at Houston, Texas, on this 29th day of January, 2020.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE